**UNITED STATES of America, Plaintiff-Appellant,**

**v.**

**Thomas Ralph FARESE et al., Defendant-Appellee.**

No. 79–2113.

United States Court of Appeals, Fifth Circuit.

March 7, 1980.

Rehearing and Rehearing En Banc Denied April 17, 1980.

Jay R. Moskowitz, Sp. Atty., U. S. Dept. of Justice, Miami, Fla., Robert J. Lehner, U.S. Dept. of Justice, for plaintiff-appellant.

James J. Hogan, Joseph Mincberg, Miami, Fla., for defendant-appellee.

Before GEWIN, RUBIN and SAM D. JOHNSON, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The sole issue on this appeal is whether there was probable cause for a state judge to issue a warrant authorizing the police to place a concealed transmitter in the offices of the defendant, Thomas Farese. The district judge accepted the recommendation of the magistrate, made after an evidentiary hearing, and granted Farese's motion to suppress the evidence gained from the listening device. The district judge found, based on the magistrate's recommendation, that certain statements in the policeman's affidavit submitted to the state judge were made with reckless disregard for their truth. He held that there was not probable cause to grant the warrant absent those portions of the affidavit. We act on the premise that his factual findings were not clearly erroneous, and we have, therefore, in accordance with the teachings of *Franks v. Delaware*, 438 U.S. 154, 158, 98 S.Ct. 2674, 2678, 57 L.Ed.2d 667 (1978), considered the affidavit after excising those portions that he found to have been included with reckless disregard for their truth. We conclude that the affidavit as thus purged is sufficient to support the state judge's finding of probable cause, *see Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723, 726 (1964), and we, therefore, reverse the judgment suppressing the evidence obtained.

If the issuance of a warrant is based solely upon information gained from an informant, the affidavit must contain (a) "some of the underlying circumstances" from which the informant drew the conclusions he presented to the police officer and (b) "some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his

information 'reliable'. Otherwise, 'the inferences from the facts which lead to the complaint' will be drawn not 'by a neutral and detached magistrate,' as the Constitution requires, but instead, by a police officer 'engaged in the often competitive enterprise of ferreting out crime' . . . ." *Id.* at 114–15, 84 S.Ct. at 1514, 12 L.Ed.2d at 729 (footnote omitted).

■ The affidavit, the full text of which, as expurgated, is attached, was executed by Detective Olivieri of the Fort Lauderdale Police Department. Much of it was based upon information provided by a confidential informant, known by the pseudonym "Jason." It manifestly disclosed enough of the underlying circumstances from which Jason concluded that Farese was operating a drug-smuggling operation from his office to allow the state judge to infer that Jason's conclusion was correct. Jason provided a wealth of detail concerning Farese's smuggling operation, including where the drugs were entering the United States (Port Everglades), the names of the freighters used to bring them to this country (the Carib Express and the Halcyon Star), and how they were distributed locally (in white trucks belonging to Al's Delivery Service). He also related activity that, while not criminal in itself, would be unusual in an office handling Farese's nominal business (contract shipping) and could be considered part of a pattern of behavior commonly associated with drug smuggling: the maintenance of elaborate secrecy concerning the contents of and transactions in Farese's office; the movement into and out of the office of large sums of cash; the presence of a telex teletype and a ship-to-shore radio in an office whose nominal business would not require them; and the frequenting of the office by persons whose appearance and behavior was unlike that of people with whom Farese could be expected to have dealings in the normal course of his nominal business. These people generally refused to give their true names, instead representing themselves as "The Sheik" or "The

Prince." [1] "A magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way." *Spinelli v. United States,* 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637, 644 (1969) (footnote omitted).

Furthermore, the state judge in this case did not have to rely solely on the amount of factual detail to support the inference that Jason came by his information in a reliable way; Jason directly stated how he obtained some of it. Specifically, Jason's claim that the marijuana was being distributed locally in white trucks belonging to Al's Delivery Service was based on his personal observation [2] of marijuana residue in the back of one of those trucks, which was loaned to him by Farese. Many of Jason's other allegations were based on what his girlfriend, who was Farese's secretary, told him. She of course would have ample opportunity to observe the suspicious activity around Farese's office.

This case is, therefore, very different from *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), where the Court held that there was a lack of probable cause in part because "if the informant came by the information indirectly, he did not explain why his sources were reliable," *id.* at 416, 89 S.Ct. at 589, 21 L.Ed.2d at 643–644. It is clear enough why Jason's

information from his girlfriend could be considered reliable. The mass of detail Jason furnished, together with his indications of how he learned those details, provided an ample basis from which the state judge could conclude that Jason was "relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation," *id.*

▪ The second of the *Aguilar* requirements, that the affidavit disclose some of the underlying circumstances from which the officer concluded that the informant was credible or his information reliable, is likewise satisfied. There is sufficient evidence in Jason's own story on the basis of which the state judge could credit Olivieri's conclusion that Jason was a reliable informant. [3] In telling Olivieri that he was a former narcotics salesman who had sold a great deal of marijuana, Jason made an admission against interest. As the Supreme Court has said, "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficiently at least to support a finding of probable cause to search." *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723, 734 (1971).

1. This unusual pattern of activity differs from the presence of two telephone lines in one apartment which the Supreme Court in *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), found to be insufficient to support a finding of probable cause. The Court said that having two phones is a "petty luxury" indulged in by "[m]any a householder," *id.* at 414, 89 S.Ct. at 588, 21 L.Ed.2d at 642, but that things would be different "in a situation in which the premises contain an unusual number of telephones or *abnormal activity* is observed," *id.* at 418, 89 S.Ct. at 590, 21 L.Ed.2d at 645 (emphasis supplied). *Cf. Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (confirmation of completely innocuous details of an informant's story sufficient to support probable cause).

2. In *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), the Supreme Court held that there was probable cause for a warrant in part because the affidavit "purport[ed] to relate the personal observations of

the informant—a factor that clearly distinguishes *Spinelli* in which the affidavit failed to explain how the informant came by his information," *id.* at 581, 91 S.Ct. at 2081, 29 L.Ed.2d 732.

3. Olivieri's failure to state specifically that he believed Jason to be "reliable" or "credible" is irrelevant. He related that Jason was knowledgeable about narcotics, confirmed much of what Jason told him and swore that he did "believe" that Farese's office was being used to conduct a drug-smuggling operation. Olivieri obviously thought Jason was credible, and to construe this affidavit otherwise because of his failure to say so in that exact language would be "the very sort of hypertechnicality—the 'elaborate specificity once exacted under common law'—condemned by [the Supreme] Court in [*United States v.*] *Ventresca* [, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)]." *United States v. Harris,* 403 U.S. 573, 579, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723, 731 (1971).

We do not, however, need to rest our holding solely upon what Olivieri in the affidavit related he had learned from Jason. He recited other facts in the affidavit that corroborated Jason's story. Farese's secretary talked to Olivieri, corroborated what Jason had said about the suspicious activity in Farese's office, and provided further details about that activity;[4] the Federal Drug Enforcement Administration independently reported that it had searched one of the ships mentioned by Jason as being used to transport drugs and had found marijuana residue aboard; the DEA later reported that this ship had left Colombia carrying marijuana and cocaine; and Olivieri himself ascertained that a license for an aviation company owned by Farese was taken out by a man who was on parole from a sentence for smuggling marijuana, that a white truck registered to Al's Delivery Service was parked behind Farese's office, and that Farese had an extensive criminal record.[5] On the spectrum of Supreme Court cases considering what amount of corroboration of an informant's tip is necessary to establish probable cause, this case clearly falls with those cases in which probable cause was upheld. *Compare United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *and Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), *with Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Even if Jason's information standing by itself were inadequate under *Aguilar* to establish probable cause, it could "fairly be said that the tip, . . . when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration," *Spinelli v. United States*, 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637, 643 (1969).

For the foregoing reasons, the judgment of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.

## APPENDIX

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY,                  FLORIDA

IN THE MATTER OF THE INTERCEPTION OF WIRE/ORAL COMMUNICATIONS OF THOMAS R. FARESE AND OTHER PERSONS UNKNOWN, IN SUITE 200, LOCATED AT 3200 EAST OAKLAND PARK BOULEVARD, FORT LAUDERDALE, COUNTY OF BROWARD, STATE OF FLORIDA, LISTED TO OLYMPIC SHIPPING LINES, INC., SAID APPLICATION BEING MADE BY FORT LAUDERDALE POLICE DEPARTMENT TO INCLUDE NOT ONLY WIRE COMMUNICATIONS, BUT ORAL COMMUNICATIONS AS WELL.

---

4. Corroboration by another person is a strong ground for crediting an informant's story, even if that other person is not named. *See Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697, 708 (1960), *cited with approval in United States v. Harris*, 403 U.S. 573, 580–81, 91 S.Ct. 2075, 2080–81, 29 L.Ed.2d 723, 731–32 (1971).

5. In *United States v. Harris*, 403 U.S. 573, 583, 91 S.Ct. 2075, 2081–82, 29 L.Ed.2d 723, 733 (1971), the Supreme Court held that a law enforcement officer's knowledge of a suspect's reputation for engaging in criminal activity may properly be considered by those assessing probable cause. If a mere reputation for criminal activity may be so considered, then *a fortiori* a criminal record may be.

**1380**

STATE OF FLORIDA   )
                       ) SS
COUNTY OF BROWARD  )

Detective L. Olivieri, being first duly sworn, states that:

1. He is a police officer of the City of Fort Lauderdale Police Department and has been employed by the City of Fort Lauderdale Police Department for the past twelve years, being involved in the past with numerous investigations regarding the forthcoming alleged violations of law.

2. Further, he is empowered to conduct investigations and to make arrests for narcotics and bribery violations prohibited by Chapters 893 and 838, Florida Statutes, and is currently responsible for the investigation detailed herein which is being carried on in an organized manner in violation of Chapters 893 and 838 of the Florida Statutes, and in aid of which investigation this is made for an Order authorizing the interception of wire or oral communications as hereinabove and hereinafter specified.

3. Your Affiant, Det. L. Olivieri, is authorized to make this application by the Honorable Philip S. Shailer, State Attorney, Seventeenth Judicial Circuit of Florida, Fort Lauderdale, Broward County, Florida; the officer authorized by statute to authorize the same.

4. Pursuant to Section 934.09(1)(b), Florida Statutes, the facts and circumstances relied upon by your Affiant to justify his belief that an Order should be issued are as follows:

a) On May 7, 1976, your Affiant met with confidential informant who will be known as "Jason." "Jason" advised your Affiant that at one time he was a member of a large-scale narcotics drug smuggling operation. "Jason" appears to the Affiant quite knowledgeable in the field of illicit narcotics. Jason has the ability to determine on sight what country marijuana had come from. His position with a former narcotics operation was that of "salesman" and sold "tons" of marijuana. [Jason advised your Affiant of an existing narcotics smuggling operation being conducted under the auspices of Olympic Shipping Lines, Inc., located at 3200 East Oakland Park Boulevard, Suite 200, Fort Lauderdale, Broward County, Florida in an office above Fred Franke's Bridge Restaurant.][1] [Material deleted]

Jason named two of three freighters that are used for this smuggling operation. One being the Carib Express and the other the Halcyon Star. [Further, Jason advised your Affiant that the narcotic drugs are being smuggled through Port Everglades, Broward County, Florida, and distributed by large trucks belonging to Al's Delivery Service. These trucks are all white in color. In the month of April 1976, Jason asked Thomas Farese for the loan of a truck to move furniture with. Thomas Farese allowed Jason the use of a large white truck. It was delivered to him by Angelo Farese. Jason advised when he opened up the back of the truck he immediately noted a very strong odor of marijuana. On further checking the truck, he observed numerous marijuana seeds and residue. Thomas Farese instructed Jason that when he was through with the truck to just park it in the Coral Ridge Shopping Center and somebody will pick it up. Jason provided your Affiant with the tag number of the truck he

---

1. The sentence in brackets was not deleted because the magistrate (and the district judge) failed to find that Olivieri swore to it with reckless disregard for its truth. In her recommendation to the district court, the magistrate quoted this sentence and the two sentences immediately following and then said that the latter two sentences (or at least part of them) had been sworn to with reckless disregard for the truth. She apparently had no objection to the retained sentence, although she quoted it together with the objectionable material and the start of her discussion.

borrowed. This truck is registered to Al's Delivery Service and is the same truck that is presently parked in the rear of Thomas Farese's office building.][2] Further, Jason advised your Affiant that Thomas Farese conducts his illicit narcotics activities in his office at 3200 East Oakland Park Boulevard, Suite 200, Fort Lauderdale, Broward County, Florida. [Material deleted]

b) On May 10, 1976, your Affiant checked Olympic Shipping Lines, Inc., and learned that it was incorporated in the State of Florida on October 10, 1975. The Resident Agent is listed as Barry G. Roderman; President is Thomas Farese; and Secretary-Treasurer is Harry W. Roth. [Material deleted]

[d) On May 21, 1976, your Affiant was advised by Special Agent Richard Doran of the Federal Drug Enforcement Administration (DEA) that the DEA office in Panama had teletyped the Miami Office and advised that a ship known as the Carib Express had left Bogota, Colombia, carrying six (6) tons of marijuana and sixty (60) kilograms of cocaine. The vessel was teletyped as being in Port Everglades. Previously, on May 14, 1976, U.S. Customs Agents had searched the vessel Carib Express in Port Everglades and discovered in the forward hull a small quantity of marijuana seeds and residue.][3] In your Affiant's experience in investigating smuggling operations in this area, and from intelligence information from federal and other state authorities, it has been normal for large freighters to "off-load" or unload, narcotics into smaller boats while still at sea in order to quickly and safely distribute the narcotics without formal entry into the Port and possible search by U.S. Customs Agents.

e) On May 19, 1976, your Affiant checked the address at 3200 East Oakland Park Boulevard, Fort Lauderdale, Broward County, Florida and there observed a large white enclosed truck bearing 1975 Florida tag 10–186396. This vehicle is registered to Al's Delivery Service. Surveillance is being maintained around the clock, but no activity was noted.

f) In the first four months of 1976, approximately 35,000 pounds of marijuana have been seized by law enforcement agents in or about Port Everglades as a result of smuggling activities.

g) Your Affiant has determined that the City License for Olympic Aviation was taken out by one William Tobin on October 21, 1975 at 3200 East Oakland Park Boulevard, same address as Olympic Shipping Lines, Inc. Olympic Aviation is also owned by Thomas Farese and appears on the same door as Olympic Shipping Lines, Inc., at the 3200 East Oakland Park Boulevard address. Tobin was described by Jason to your Affiant and is presently on Federal parole for smuggling marijuana (see Exhibit "B" attached hereto and made a part hereof). Tobin spent his prison sentence at Eglin Air Force Base from July 14, 1971 through June 17, 1974. Thomas R. Farese was sentenced to Eglin Air Force Base on August 1, 1973 for interstate transportation of forged securities but released on June 21, 1974—four (4) days after Tobin.

h) Thomas R. Farese has an extensive criminal record, which is attached hereto and made a part hereof as Exhibit "C." Farese has arrests for attempted bribery of a police officer in 1965 and offering gift to municipal employee as part of an apparent larceny case in 1966.

Jason told your Affiant that he is very friendly with an employee who works for Thomas Farese at the Olympic Shipping Lines, Inc. This employee has been employed by Thomas Farese for approximately one (1) year, and had confided certain information to Jason. That information regards

---

2. The passage in brackets was not deleted because the magistrate, while discussing it at some length and noting that certain inaccuracies in it prevented the state judge from considering the allegations it contains in their true colors, did not find that Olivieri swore to it with reckless disregard for the truth.

3. The passage in brackets was not deleted because the magistrate, while again noting certain inaccuracies in it, did not make any finding of reckless disregard for the truth, but merely stated that these inaccuracies were "only another example of what was clearly a confused and badly conducted investigation."

people who have been seen entering the private office of Thomas Farese located in the top floor, Suite 200, at the Southeast corner of the building of 3200 East Oakland Park Boulevard, Fort Lauderdale, Broward County, Florida, above Fred Franke's Bridge Restaurant, top floor with two (2) windows facing East and two (2) windows facing South in said office, wherein the front door of said general office displays the following information as to the companies residing therein:

"United Properties Company"

"Olympic Shipping Lines, Incorporated"

"Consolidated Shipping Industries"— Grand Caymen Islands

"Gold Coast Amusements, Incorporated"

"Olympic Film Producers, Incorporated"

The employee advised Jason that on April 29, 1976, a subject was seen entering Thomas Farese's inner office in Suite 200 above described with a briefcase. Subject's name is known only to the employee and to Jason, who also observed the subject enter the room with a briefcase, as "Vic." The employee advised Jason that "Vic" was observed to open the briefcase inside said inner office and that it was filled with cash American money.

Jason advised your Affiant that nearly every day up until the date of this Affidavit, he has seen "hippie-type" individuals with beards, long hair, T-shirts, levis (all non-business types), some with briefcases and some not, meet in Farese's inner office for five (5) minutes at a time, everytime in a closed door meeting.

The employee advised Jason that on May 13, 1976, a black male named John Grant, who dresses strikingly in a white suit, white hat, and comes into Farese's inner office in Suite 200 approximately two (2) times a month in the manner above-described, sometimes with a briefcase, sometimes without, entered Farese's inner office. Jason advised your Affiant that all these meetings occur behind closed doors. Jason advised your Affiant that the door that separates the Farese inner office from the confines of the above described general

Suite 200 offices on the top floor, is always closed during these meetings and the office itself contains numerous files and a safe within which there is another safe. There are three (3) locks on the outside of the inner office door; one (1) key is in Farese's possession, one (1) key is in the possession of Harry Roth, an associate of Farese, and one (1) key is kept in the second (2nd) safe above-described. Further, there is a time lock on that door, and the said time lock can only be operated by Farese. Also on the above date, May 13, 1976, the employee advised Jason that at approximately 2:00 P.M., Harry Roth went inside Farese's office above-described. The employee further advised that there was a silence, then the employee heard a noise sounding like someone was getting "bounced off the walls." Glass was heard breaking and someone hit the bolt lock at the top of Farese's inner office door. The employee heard Farese yell "Sit down and shut-up." For a long period of time, the employee heard nothing, and at approximately 6:00 P.M., the sound of someone possibly crying was heard by the employee. Farese came out of his inner office with blood on his wrist, and told his secretary to go get some coffee; at that time the employee could see Grant sitting in the inner office holding his jaw. The secretary got the coffee, and Farese took the coffee back inside the inner office. The employee left from work at 6:15 P.M., with Jason and never did see Grant after that.

Your Affiant had made a background check of the employee and has determined that the employee has no prior criminal record of any type. The employee has been directed by Thomas Farese, "You don't know anything about anything that goes on in here, and forget any names of persons or calls that I get." There never appears to be appointments for Farese, but people arrive who are "expected" in that each individual is immediately ushered into the closed inner office. Most persons arriving refuse to give last names but represent themselves as "Vic," "The Prince," "The Shiek," and others.

One James Monaco was arrested by the Fort Lauderdale Police Department. He is a multi-offender in narcotics violations. In the possession of James Monaco was the telephone number of B. L. David, an Assistant State Attorney in Broward County at area code (305) 949–1341 and area code (305) 765–4164, both office numbers at the office of the Broward County State Attorney. Agents of the Drug Enforcement Administration and United States Customs Intelligence have advised your Affiant that Monaco is known to them to be running small boats to the Carib Express, one of the ships owned by the corporations listed herein, in the open sea, and taking contraband from that ship so that it does not have to go through Port Everglades loaded.

On May 27, 1976, your Affiant met with the employee in a covert-type meeting. Your Affiant questioned the employee as to the information that was being supplied to your Affiant by Jason. The employee corroborated the information supplied to your Affiant by Jason. The employee had agreed to act as a confidential informant with the promise that the employee's identity would not be disclosed. The employee advised that Nicholas "Jiggs" Forlano, who is known to your Affiant as being an extremely high ranking member in the Joseph Columbo "family" and has been confirmed by the Federal Bureau of Investigation to hold this position, is in the office on a daily basis. The employee advised your Affiant that Thomas Farese holds several meetings per day with shady-type looking characters behind the closed doors of his office. The employee advised that the few employees that work in the office are aware that illegal activities are going on in Thomas Farese's office but "close their eyes" for fear of losing their jobs.

Attached hereto and made a part hereof as Exhibit "D" is a diagram of the said office complex at the address of 3200 East Oakland Park Boulevard, Fort Lauderdale, Broward County, Florida. The office in which your Affiant wishes to place an electronic surveillance device is designated with a red "X."

Your Affiant has checked with the Broward County Courthouse in reference to obtaining the recorded deed on the Bridge Restaurant, and found that on April 1, 1976, the deed was recorded to one Angelo Farese.

Your Affiant believes that the above information shows a clear pattern of narcotics and bribery involvement by Thomas R. Farese and believes that the office described in Exhibit "D" attached is a "drop off" for monies and other smuggling activities. Jason has advised your Affiant that in the above room there is also a telex teletype and a ship to shore radio in that room. In that your Affiant believes that smuggling is going on and that a person or persons may be bribed, it would be convenient for a system of communications similar to the above to contact the freighters carrying narcotics about a police raid or customs inquiry on information received through bribed channels. A ship to shore radio is unusual located on East Oakland Park Boulevard at the address of a contract shipping, not a *receiving*, office.

From the period of May 3, 1976 to present date, there has been extremely heavy news releases both through newspaper, television and radio regarding the smuggling of narcotics drugs through Port Everglades. Due to this fact, it has been to no avail to surveil persons or vehicles or vessels.

The purpose of the wire/oral communications intercept in the office of Thomas R. Farese at Olympic Shipping Lines, Inc., 3200 East Oakland Park Boulevard, Suite 200, Fort Lauderdale, Broward County, Florida, is to identify all parties involved in this or any illicit operation and to learn when and where a shipment of narcotic drugs will be smuggled into South Florida; your Affiant believes that an Order intercepting wire and oral communications from the office located in Suite 200 at 3200 East Oakland Park Boulevard, Fort Lauderdale,

Broward County, Florida will identify those persons as well as persons who may be in public office and are participating in violations of the Bribery Statutes of the State of Florida.

Your Affiant has verified that Suite 200, 3200 East Oakland Park Boulevard, Fort Lauderdale, Broward County, Florida, is listed in the name of Thomas R. Farese.

5. Pursuant to Section 934.09(1)(c), Florida Statutes, a particular description of the type of communications sought to be intercepted is as follows: Oral conversations between Thomas R. Farese and any person or persons unknown with whom Thomas R. Farese is conspiring in violation of the laws of the State of Florida, as stated in paragraph 4 (inclusive) above. Further, pursuant to Section 934.09(1)(c), Florida Statutes, the Affiant states that the following investigative procedures are usually employed in the investigation of this type of criminal case:

a) Search Warrants
b) Confidential Informants
c) Surveillance—Visual
d) Undercover Agents
e) Use of Subpoena or Grand Jury
f) Interviews

Those procedures have either been tried and failed or reasonably appear to be unlikely to succeed for the following reasons:

a) There is no reason to suspect that execution of a *search warrant* would reveal the *names* of the people with whom Thomas R. Farese is conspiring. While materials may possibly be seized, if the names are not also uncovered, not only would the reason for this investigation be frustrated, but the principals would be alerted of this investigation and other avenues would be compromised.

b) Your Affiant has attempted to use a *Confidential Informant* but his effectiveness is merely to make contact with the employee herein and make limited visual observations not identify other people who are conspiring with Thomas R. Farese, nor is he able to gain access to the room wherein it is alleged that the meetings herein are conducted.

c) Physical *surveillance*, on the occasions that it was used, has proven unsuccessful in any identification whatsoever, and has only established the physical description of the premises and the participants herein. The room herein described is nearly impossible to surveil due to its secrecy.

d) Your Affiant has considered the use of an undercover agent but is convinced that no one will be taken into the confidence of Thomas R. Farese unless he is already known to Farese or, in all probability, referred from a known source of Farese's.

e) There is no reason to believe that Thomas R. Farese would testify before a *Grand Jury* or *State Attorney* under subpoena without a grant of immunity to him and your Affiant feels that immunizing Thomas R. Farese would not serve the aids of justice.

f) Your Affiant has considered the use of interviews with neighbors or area merchants but your Affiant is unaware of Farese's contacts and fears that the integrity of this investigation may be compromised by such haphazard interviewing.

6. Pursuant to Section 934.09(1)(b), Florida Statutes, a particular description of the nature and location of the facilities from which the communications are to be intercepted is as follows: The private office of Thomas R. Farese located in the top floor, Suite 200, at the Southeast corner of the building of 3200 East Oakland Park Boulevard, Fort Lauderdale, Broward County, Florida, above Fred Franke's Bridge Restaurant.

7. Pursuant to Section 934.09(1)(b), Florida Statutes, a particular description of the type of communications sought to be intercepted between Thomas R. Farese and oth-

er unidentified persons and their identities with the communications consisting of conspiracies to commit bribery and narcotics smuggling contrary to Florida State Statutes 893, 838 and 833.

8. Pursuant to Section 934.09(1)(c), Florida Statutes, a full and complete statement of why other investigative procedures reasonably appear unlikely to succeed have been listed in Paragraphs I(a), (b), (c), (d), (e) and (f) herein.

9. Based upon your Affiant's experience in the investigation of narcotics and bribery violations and the facts as contained herein, your Affiant believes that oral or wire communications herein sought to be intercepted as evidence is not legally privileged.

10. Your Affiant, therefore, has reasonable grounds to believe, and in fact, does believe, that conspiracies to commit bribery and narcotics smuggling are being carried on at Suite 200, Southeast Office, 3200 East Oakland Park Boulevard, Fort Lauderdale, Broward County, Florida, pursuant to the foregoing information.

Pursuant to Section 934.09(1)(d), Florida Statutes, the period of time that the interception will be required to be maintained will be until communications are intercepted which will permit investigators to identify the unknown person or persons with whom Thomas R. Farese is conspiring to violate the narcotics and bribery laws of the State of Florida, and which will reveal the complicity of the unknown person or persons in the criminal conspiracy above described, but in no event shall the period of time be longer than thirty (30) days from the date of this Order, whichever is earlier.

11. Pursuant to Section 934.09(1)(3), Florida Statutes, to the Affiant's knowledge, no other order has been made for an Order authorizing the interception of communications regarding the premises, above described, (and/or) the indicated persons, (and/or) any persons connected with this particular activity at Suite 200, Southeast Office, 3200 East Oakland Park Boulevard, Fort Lauderdale, Broward County, Florida.

12. Your Affiant states that all reasonable means will be taken to protect any innocent users or guests of or at the above described office from the interception of their wire or oral communications. Safeguards include, but are not limited to, the following:

a) A constant surveillance will be maintained on recording devices and upon ascertaining that an innocent conversation is in progress, the recording device will be turned off.

13. Pursuant to Section 934.07, Florida Statutes, the duly executed authorization of the Honorable Philip S. Shailer, State Attorney for the Seventeenth Judicial Circuit of the State of Florida, is attached hereto, made a part hereof, and incorporated herein by reference, but more specifically, as Exhibit "A," as aforesaid in Section 3 above.

WHEREFORE, pursuant to Section 934.-07, Florida Statutes, Affiant prays that an Order authorizing the interception of wire or oral communications from the premises located at Suite 200, Southeast Office, 3200 East Oakland Park Boulevard, Fort Lauderdale, Broward County, Florida, be issued according to law, commanding Chief Leo F. Callahan, and all duly authorized police officers and agents of the City of Fort Lauderdale Police Department, with the proper and necessary assistance, in the daytime or the nighttime, or on Sunday, as the exigencies of the situation may demand or require, to intercept wire or oral communications of the type described above, and to make duly constituted reports, records and transcripts thereof, according to law.

(s) Det. L. Olivieri

Detective L. Olivieri
Strategic Intelligence Section
Organized Crime Bureau
Fort Lauderdale Police Department

**1386**

SWORN TO AND SUBSCRIBED before me this 28th day of May, 1976.

(s) <u>M. Daniel Futch, Jr.</u>

M. DANIEL FUTCH, JR., Judge
Seventeenth Judicial Circuit
Broward County, Florida.