**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**David Israel NAMER,**
**Defendant-Appellant.**

**No. 80–3611.**

United States Court of Appeals,
Fifth Circuit.

July 22, 1982.

Opinion on Denial of Rehearing
Oct. 18, 1982.

John R. Martzell, John Wilson Reed, New Orleans, La., for defendant-appellant.

Pauline F. Hardin, Robert J. Boitmann, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before CLARK, Chief Judge, GEE and GARWOOD, Circuit Judges.

CLARK, Chief Judge:

David Israel Namer was convicted of various federal crimes arising out of a fraudulent loan brokerage scheme. The prosecution secured evidence used at his trial as a result of a search and seizure of Namer's complete office records conducted by Louisiana officials pursuant to a broad search warrant issued by a Louisiana magistrate. The district court denied Namer's motion to suppress evidence seized during and derived from the search. On appeal, Namer argues that the warrant was invalid under the probable cause and particularity clauses of the fourth amendment.[1] We reverse because there was not probable cause to support the warrant's issuance, and remand with instructions to the district court to conduct a hearing to determine whether Namer's conviction should be affirmed on grounds of harmless error, inevitable discovery, independent source, or attenuation.

## I

Pauline Hardin, then an Assistant District Attorney in Orleans Parish, Louisiana, took charge of an investigation into the business affairs of David Namer in late 1976 or early 1977. Hardin and her coinvestigators, Assistant District Attorney Robert Barnard and New Orleans Police Officer James Dall, were members of the Economic Crime Unit of the Orleans Parish District Attorney's office. Namer and his company, National Financial Management Services, Inc., served in a general financial advisory capacity and, in particular, acted as loan brokers and assisted businesses and individuals, most of whom were engaged in the construction business, in obtaining loan commitments.

During the course of their investigation, Hardin and members of her team contacted Harry Stansbury, Deputy Commissioner of Securities for the State of Louisiana, to ascertain whether the loan commitments and loan commitment applications in which Namer was dealing were securities within the meaning of the Louisiana Blue Sky Law, La.Rev.Stat.Ann. §§ 51:701–720 (West 1965 & West Supp.1982). Stansbury opined in conversations with the investigation team that the loan instruments probably were securities within the meaning of the law, that they had not been registered with the Commission, and that Namer was not registered as a broker-dealer with the Commission. Based on Stansbury's opinion and on information from other sources that Namer was dealing in loan commitments, the investigation team applied for a warrant to search Namer's offices.

The search warrant application,[2] signed by Officer Dall and drafted by Hardin and Barnard, explained generally the course of the investigation, described specifically the transactions one named individual had with

---

1. The fourth amendment, U.S.Const.amend. IV, provides:

   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

2. The search warrant application's statement of "reasons and facts for the request[ed]" search warrant is reproduced as Appendix A to this opinion. *Infra,* p. 1098.

Namer, and placed at least one loan commitment on the premises of Namer's offices. Furthermore, the application stated that Harry Stansbury, Deputy Commissioner of Louisiana Securities Commission[,] has advised the Orleans Parish District Attorney's Office that the offerings being made ... are classified as securities ... [,] that these offerings are not registered with them and that David Namer is not a licensed broker-dealer as required by law.

In the application, Namer's conduct in selling or offering to sell unregistered securities is alleged to be violative of two provisions of the Louisiana Blue Sky Law. The two provisions make it unlawful to sell unregistered securities, La.Rev.Stat.Ann. § 51:706(A),[3] and unlawful to sell securities without registering as a broker-dealer with the Securities Commission, id. § 51:710.[4]

Based on the search warrant application, the magistrate issued a search warrant. The warrant authorized a sweeping search of Namer's offices for a wide variety of business papers.[5] Officer Dall and others executed the search warrant on the afternoon of its issuance. They seized and carried away all of the current working files, assorted correspondence, corporate and personal checkbooks, bank and financial statements, and various other items. The record does not indicate that any criminal action has been brought by the Orleans Parish District Attorney's Office predicated on the alleged Blue Sky Law violations cited as justifying the search warrant.

Pauline Hardin, the Assistant District Attorney who led the Economic Crime Unit's investigation of Namer, joined the federal government as an Assistant United States Attorney for the Eastern District of Louisiana shortly after the search. Within three months, a federal grand jury issued a subpoena to the state district attorney's office for the documents seized in the state search. Subsequently, Namer and two others were indicted by a federal grand jury and charged with conspiracy, wire fraud, and inducing persons to travel in interstate commerce for a fraudulent purpose.[6] Pauline Hardin, among others, signed the indictment.

The indictment, in essence, alleged that Namer acted criminally in three separate transactions which can most succinctly and accurately be denoted loan brokerage scams. In those transactions, Namer allegedly secured loan commitments for three clients from an insolvent lending institution. · Namer, in concert with his brother and an officer of the lending institution, allegedly knew the loan commitments were worthless when he procured them and extracted brokerage fees.

Namer pled not guilty to each count of the indictment and filed a motion to suppress the evidence seized during and derived from the 1977 state search of his offices. After a hearing, the motion to suppress was denied. A jury found Namer guilty on four counts of the indictment. After the grant of a new trial on a ground unrelated to the present proceeding, Namer was again convicted on the same four counts.

3. La.Rev.Stat.Ann. § 51:706(A) provides, in part, that "[n]o securities, except of a class exempt under any of the provisions of R.S. 51:704 or unless sold in any transaction exempt under any of the provisions of R.S. 51:705, shall be sold within this state unless such securities have been registered by notification or by qualification." The term "security" is defined by id. § 51:701(1). *See infra* note 13.

4. La.Rev.Stat.Ann. § 51:710(A) provides that "[n]o person shall engage in business in this state as a broker-dealer or agent-salesman unless he has been registered as a broker-dealer or agent-salesman in the office of the commissioner pursuant to the provisions of this section." A "broker-dealer," one generally engaged in buying or selling securities, is fully defined by id. § 51:701(4).

5. The provision of the search warrant enumerating the items to be seized is reproduced as Appendix B to this opinion. *Infra,* p. 1099.

6. Namer was indicted under the aiding and abetting, 18 U.S.C. § 2, wire fraud, id. §§ 1341 & 1343, and inducement of interstate travel to execute a fraud, id. § 2314, provisions of the United States Code.

Namer appeals the denial of his suppression motion. He also argues that collateral estoppel should have barred presentation of certain evidence at his second trial. We need reach only the first issue presented on appeal. Because there was not probable cause to support the issuance of the search warrant pursuant to which Namer's office was searched we reverse.

## II

Namer's challenge to the Louisiana warrant pursuant to which his office was searched relies on both the probable cause and particularity clauses of the fourth amendment. At the outset, we note that the most striking aspects of the warrant are that it was premised on alleged criminal violations under a novel legal theory and that it authorized a search and seizure of virtually all of Namer's papers. As the First Circuit has cautioned, since the demise of the mere evidence rule [7] and the removal of business records from the self-incrimination protections of the fifth amendment,[8] the particularity and probable cause commands of the fourth amendment are "the only protection a citizen now has against a general search of his private papers." *United States v. Abrams*, 615 F.2d 541, 547 (1st Cir. 1980). While we do not suggest that the papers of white-collar criminal suspects are entitled to greater fourth amendment protection than the guns and knives of violent street criminals, we do not deny that the application of fourth amendment principles to the ferreting out of white-collar criminal conduct often requires a unique approach by investigating officers. Today's case, in which we hold that there was not probable cause to support the Louisiana warrant, graphically illustrates this point.

### A

After conducting an approximately year-long investigation into Namer's business af-

fairs, Assistant District Attorney Hardin and her colleagues settled on the theory that Namer had violated the Louisiana Blue Sky Law by failing to register the loan commitments as securities and by failing to register as a broker-dealer with the Securities Commission. That theory can be characterized, at best, as novel, and, at worst, as frivolous.[9]

In applying for a search warrant, however, the District Attorney's Office camouflaged the novelty of the legal theory under which it was proceeding. The affidavit stated that Deputy Commissioner Stansbury had advised the Economic Crime Unit that· the offerings being made by Namer "are classified as securities." Confronted with the statement that the offerings were "classified as securities," the magistrate was justified in concluding that there was probable cause to believe that a crime had been committed. However, the truth of the matter is that the Securities Commission had no formal procedure for classifying offerings as securities and that Stansbury gave the District Attorney's Office only a qualified opinion that the instruments in which Namer was dealing were securities. Our task is to determine whether the misrepresentation of the status of the offerings is material and reckless under the standards of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A conclusion that it is requires consideration of whether the remainder of the search warrant application alone would provide probable cause to believe that a crime had been committed.

### B

■ The Supreme Court's decision in *Franks v. Delaware, supra,* outlines the con-

---

7. See *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

8. See *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

9. Perhaps the most telling evidence of the lack of merit of the theory is that the Orleans Parish District Attorney's Office, even with its "proof" firmly in hand, never brought criminal charges against Namer premised on Blue Sky Law violations.

sequences flowing from a misrepresentation in a search warrant application.[10] The Court there held that if

> a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, . . . , [and that if], with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–56, 98 S.Ct. at 2676, 57 L.Ed.2d at 672. Put another way, if a search warrant affidavit contains a material misstatement made intentionally or with reckless disregard for the truth, the court should excise the offensive language from the affidavit and determine whether the remaining portion establishes probable cause.

▉ We have no difficulty determining that the search warrant application stating that Stansbury had told the Economic Crime Unit that the offerings were "classified as securities" is a misstatement and a material one at that. During the suppression hearing, Namer's attorney questioned Stansbury on the matter of his actual representations to the Economic Crime Unit. Those exchanges went as follows:

> Q. Did you ever tell the Office of the District Attorney for the Parish of New Orleans that the transactions . . . were actually classified as securities? And I want you to be very specific about that. . . .
>
> A. I think I understand your question. . . . I did specifically say that the elements of the securities transaction, you know, were present; and it probably

was securities. A lot of that, of course, was my opinion at the time.

> \*　\*　\*　\*　\*　\*
>
> Q. Is there a classification process? Does Louisiana Securities Commission engage in a classification process?
>
> A. There is no specific process for determining whether or not something is a security.
>
> \*　\*　\*　\*　\*　\*
>
> Q. Did you ever tell the District Attorney's Office that Mr. Namer's transactions were classified as securities?
>
> A. I think I told them that I felt it was, the documents could be securities.
>
> \*　\*　\*　\*　\*　\*
>
> Q. Did you yourself ever tell, in your official capacity as director of Louisiana Securities Commission, Mr. Namer's transactions were classified as securities?
>
> A. I can't recall. I think I told them that I felt it was securities. A lot of it was opinion. Our office had not had a lot of contact with this particular element at that time, this type of securities transaction.

Stansbury's admission that the Commission has no formal classification procedure and his inability to claim that he gave the District Attorney's Office any more than a qualified opinion that the offerings were securities lead us to conclude that the affidavit misstated his representations.[11]

The Supreme Court has noted that:

> affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. . . . [T]he courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.

---

**10.** The *Franks* opinion also dealt with the issue of when a hearing must be held after a challenge to the veracity of a search warrant affidavit has been made. We do not face the issue of whether a hearing was required since Namer was allowed to present evidence on the issue at the suppression hearing. *See United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980).

**11.** *Cf. United States v. Marcello*, 508 F.Supp. 586, 605 (E.D.La.1981) (representations inaccurate in isolation did not mislead magistrate because they were accurate when placed in context).

*United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). In the case before us, the affidavit was drafted by two attorneys during the course of a lengthy investigation at a time when they were not beset by any exigent circumstances. The word "classified" connotes the authoritative result of ordered procedures and methodologies, not an ad hoc and qualified oral opinion of a single agency employee. The affidavit's statement is no less a misrepresentation because it manipulates the facts subtly. By using the word "classified," the affiant inaccurately described ' what had transpired. Since the statement that the instruments were "classified as securities" was the only item in the affidavit tending to establish that Namer had acted criminally, we also conclude that the misrepresentation was material. The more difficult issue is whether Namer has established by a preponderance of the evidence that the misrepresentation was made intentionally or with reckless disregard for the truth.

*Franks* and its lower court progeny offer little guidance to us in determining whether a misrepresentation has been made intentionally or with reckless disregard for the truth, on the one hand, or negligently, on the other. In *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980), this court was faced with an omission from, as opposed to a misrepresentation in, an affidavit. The panel recognized that this circuit treats omissions essentially the same as misstatements. *Id.* More pertinent to our inquiry, the court noted that "[i]t is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." *Id.* at 329. This recognition that the analytical concepts of materiality and recklessness are often bound together is significant in this case. The misrepresentation was a crucially material one. From that finding of vital materiality and other circumstances surrounding the investigation, we conclude that the misrepresentation was made, at the least, with reckless disregard for the truth.

The search warrant application was drafted by three members of the Economic Crime Unit of the Orleans Parish District Attorney's Office after a year-long investigation into Namer's business affairs. The two principal draftsmen were attorneys with at least some exposure to the legal and factual intricacies often involved in detecting and prosecuting white-collar crime. It is not shown that they acted in a hurried fashion. Rather, we presume from the pace of the investigation and the frequency of their conversations with Stansbury that they acted deliberately and that they were aware of the novelty of their legal theory. We also note that a strong opinion from Stansbury was the best, if not only, hope for conferring an aura of legitimacy on their legal theory. Given all of the above— lengthy investigation, draftsmen trained in the law with experience in white-collar criminal prosecution, lack of exigency, novel legal theory, appreciation of the importance of Stansbury's opinion, and understanding of the informal process by which Stansbury reached and rendered his opinion—we conclude that the members of the Economic Crime Unit proceeded in reckless disregard of the truth when they characterized Stansbury's ad hoc, oral opinion as a "classification." The circumstances surrounding the investigation and warrant application permit no other reasonable conclusion. Were we to construe the warrant application as having used the words "classified as securities" merely to refer to the expression of an ad hoc informal oral opinion, we would conclude, for the reasons stated in II C below, that the application was an insufficient basis on which to rest a determination of probable cause.

C

. Our conclusion that the affidavit's characterization of Stansbury's views was a reckless and material misrepresentation requires us to purge the affidavit by excising the misrepresentation and then to determine whether the purged affidavit would be sufficient to support a probable cause finding. *See United States v. Farese*, 612

F.2d 1376, 1377 (5th Cir.), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980).

■ In a search warrant case, the magistrate must have probable cause to believe that certain items evidence criminal activity and that those items are presently located at a certain place. The concern in the case at hand is whether the magistrate, reviewing the purged affidavit, would have probable cause to believe that Namer's loan transactions constituted criminal activity.[12]

On the issue of probable cause to believe a crime has been committed, the Supreme Court has stated:

"The substance of all the definitions" of probable cause "is a reasonable ground for belief of guilt." And this "means less than evidence which would justify condemnation" or conviction. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

*Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879, 1890 (1949) (citations omitted). Our examination of the purged affidavit leads us to conclude that the evidence presented there is insufficient to give reasonable grounds for a belief that Namer was engaged in criminal activity.

Purged of the improper passage, the only non-conclusory averment that Namer was

selling securities is the statement by an ex-client of Namer that he paid an advance fee to Namer on a loan commitment application and that he saw an approved loan commitment in Namer's office. Thus, the purged affidavit reveals at best that Namer dealt in loan commitments in two instances. Since the crimes that the affidavit states were committed by Namer require the sale of securities, a common-sense reading of the affidavit discloses that the loan commitments are the securities in question. The probable cause issue is this: Whether a magistrate would be justified in concluding that the sale of loan commitments violates the Louisiana Blue Sky Law. Without the guidance of an official classification, or the equivalent, by the Deputy Blue Sky Commissioner, the magistrate would be obliged independently to draw a conclusion on the issue.

■ We hold that a magistrate presented with the purged affidavit would not have probable cause to believe that Namer was engaged in criminal activity. This is so because the District Attorney's novel legal theory that the loan commitments were securities under the Louisiana Blue Sky Law is simply untenable and because the purged affidavit fails to provide an adequate explanation and description of the allegedly illegal transactions. In discussing the status of the loan commitments as securities, we review the jurisprudence on the issue extant when the magistrate would have been presented with the purged affidavit.

We first turn to cases interpreting the definition of "security" appearing in the federal securities law, and then discuss a unique aspect of the Louisiana Blue Sky Law. The definition of a security in the Louisiana Blue Sky Law[13] was patterned

---

**12.** In considering whether a purged affidavit establishes probable cause, we are proceeding somewhat hypothetically. Since the Louisiana magistrate never considered the purged affidavit, the normal presumption of validity attaching to a magistrate's probable cause finding does not apply. *See* 2 W. LaFave, *Search and Seizure* § 4.4, at 68 (1978).

**13.** La.Rev.Stat.Ann. § 51:701(1) provides that: "Security" shall include any note, stock, treasury stock, bond, debenture, evidence of indebtedness, warehouse receipt, certificate of interest or participation, or the right to subscribe to any of the foregoing, certificates

of interest in a profit sharing agreement, certificate of deposit for a security, collateral trust certificate, pre-organization certificate, pre-organization subscription, voting trust certificate, any transferable share, investment contract, or beneficial interest in title to property, profits or earnings, or in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim bond, debenture, note, certificate, or receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. "Security" does not include any insurance or

after and very nearly duplicates the federal securities law definition of a security.[14] See Caldwell v. Trans-Gulf Petroleum Corp., 322 So.2d 171, 174–75 (La.1975). Considering the dearth of reported cases construing the Louisiana Blue Sky Law definition of a security, see Lyman, Securities Regulation in Louisiana—A Practical Introduction to the Blue Sky Law, 16 La.B.J. 327, 328 n.3 (1969), we turn to cases interpreting the federal securities law definition of a security.

Few decisions address the issue of whether a loan commitment is a security. The Tenth Circuit looked at the facts and circumstances surrounding the purchase of a loan commitment by a real estate developer and concluded that it was not a security. McGovern Plaza Joint Venture v. First of Denver Mortgage Investors, 562 F.2d 645, 647 (10th Cir. 1977). The court in McGovern first noted that the phrase "loan commitment" is not mentioned in either of the federal statutory definitions.[15] Id. at 646. The court then turned to the catch-all statutory phrase "investment contract" and determined that the transaction at issue was purely commercial in character and not an investment. Id. at 647. From this, the court concluded that the loan commitment transaction did not involve a security. Id. at 648.[16]

In Lee v. Navarro Savings Association, 416 F.Supp. 1186 (N.D.Tex.1976), rev'd on other grounds, 597 F.2d 421 (5th Cir. 1979), aff'd, 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), a court in this circuit heard a claim for damages arising from the breach of a loan commitment agreement. The court held that the defendant's loan commitment letter was not a security under the federal securities law. Id. at 1190–91. The court in Navarro Savings cited Bellah v. First National Bank of Hereford, 495 F.2d 1109 (5th Cir. 1974). In Bellah, 495 F.2d at 1112–13, and McClure v. First National Bank of Lubbock, 497 F.2d 490, 494–95 (5th Cir. 1974), cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), this circuit adopted the commercial/investment dichotomy to determine whether a loan transaction is a security.

■ We fail to see how Namer's transactions could be characterized as investment-oriented under the Bellah-McClure test. Namer's clients came to him with the intention of structuring commercial deals, namely, to arrange the financing of construction projects. They came, not with the expectation of profits, see United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 852–59, 95 S.Ct. 2051, 2060–63, 44 L.Ed.2d 621 (1975), but with hopes of obtaining fixed loan commitments. Such a transaction is not within the ambit of the federal securities law definition of a security. As this court has stated before, "[w]e doubt that Congress intended by [the securities law] to render federal judges the guardians of all beguiled makers or payees." Bellah, 495 F.2d at 1114. Had the Louisiana magistrate been presented with the purged affidavit, he would have found no comfort in the federal jurisprudence for a determination that Namer was engaged in criminal activity.

Likewise, the Louisiana Blue Sky Law undermines the possibility of a probable cause determination. Aside from the fact that a Louisiana magistrate would interpret

---

endowment policy or annuity contract fixed or variable, which is authorized to be written pursuant to Title 22 of the Louisiana Revised Statutes of 1950, as amended.

**14.** Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), provides:

When used in this subchapter, unless the context otherwise requires—

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any certificate or instrument commonly known as a

"security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The definition of security in the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), is essentially the same. See United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 847 n.12, 95 S.Ct. 2051, 2058 n.12, 44 L.Ed.2d 621 (1975).

**15.** Nor is it mentioned in La.Rev.Stat.Ann. § 51:701(1). See supra note 13.

**16.** The Tenth Circuit's decision in McGovern substantially narrowed that court's earlier decision in United States v. Austin, 462 F.2d 724 (10th Cir.), cert. denied, 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972).

the language of the Blue Sky Law definition of a security not to include a loan commitment, there is also significant support in the legislative background of the Blue Sky Law for the proposition that the legislature did not intend loan brokers to be covered by that law. In 1969, loan brokers were placed under the comprehensive regulatory authority of the Louisiana Securities Commission. *See* 1969 La.Acts 61 & 66. The 1969 Blue Sky Law amendments required loan brokers to register with the Commission, set registration fees, and instructed the Commissioner to prescribe a written examination and minimum acceptance standards for loan brokers. 1969 La. Acts 66. A "loan broker" was defined as "any person who . . . acts as a go-between, finder or agent of a lender or borrower of money for the purpose of procuring a loan of money." 1969 La.Acts 61. Without explanation, the legislature deleted the provisions relating to loan brokers from the Blue Sky Law in 1974. *See* 1974 La.Acts 493; Louisiana Legislative Council, *Acts, Resolutions and Vetoed Bills*, La.Legis., 37th Reg. Sess., Resume at 140–41 (1974). In the pre-1974 Blue Sky Law, the definitions section separately defined "broker-dealer" and "loan broker." In the amended version, the statutory definition of loan broker was deleted and that of broker-dealer left intact. The legislature's action in removing loan brokers from the regulatory jurisdiction of the Louisiana Securities Commission renders it highly doubtful that they remain implicitly covered by the general provisions of the Blue Sky Law.[17]

To summarize, we find two compelling reasons to conclude that, under the purged affidavit, there was no probable cause to believe that Namer had engaged in criminal activity. First, the cases analyzing the issue of whether a loan commitment is a security have held that it is not, and the peculiar legislative history of the Louisiana Blue Sky Law evidences a legislative intent that loan brokerage activities not be covered by that law. The purged affidavit offered the bald assertion that Namer's loan brokerage activities violated provisions of the Blue Sky Law. That assertion was as specious in 1977 as it is today.[18]

■ Furthermore, even if the status of loan commitments as securities had been a closer question, the purged affidavit would have given the magistrate insufficient information about the nature of the loan commitment transactions to make an independent judgment on the existence of probable cause. *See Whitely v. Warden*, 401 U.S. 560, 564, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306 (1971). The determination that a transaction involves securities. is particularly dependent on the facts and circumstances of the transaction. The purged affidavit does not supply any details with respect to Namer's loan commitment transactions, and hence, could not support a probable cause determination.[19]

### D

■ The final disposition of this case is not reached by the conclusion that there was no probable cause to issue the search warrant. The government argues that, even if the search warrant was invalid, the doctrines of inevitable discovery, independent source, attenuation, and harmless error require that Namer's conviction be affirmed. Since the district court denied Namer's motion to suppress, no hearing was held on these issues and no factual findings were made. Thus, the record before us is inadequate as a basis for determining whether any of these harmless error doc-

---

**17.** One Louisiana court has noted the absence of a similarity between loan commitments and securities. *See Talbot v. Jones*, 288 So.2d 80, 83 (La.App.1974).

**18.** At least two civil actions have been brought against Namer alleging securities law violations. One district court, relying on *McGovern*, dismissed on the ground that the loan commitment transaction in question did not involve securities under federal, Illinois, or Louisiana law. *North American Int'l Dev. Ltd. v. Allied Consultants, Inc.*, No. 77–C–3593, slip op. at 5-6 (N.D.Ill. Jan. 31, 1979). The other court dismissed without issuing an opinion. *O'Riley Bros. Constr. Co. v. Namer*, No. 78–3990 (E.D.La. Apr. 4, 1979).

**19.** Had the facts and circumstances of Namer's loan commitment transactions been spelled out in the purged affidavit and had the law less clearly established that loan commitments are not securities, a finding of probable cause might have been justified. Nothing in this opinion should be construed to require a warrant-issuing magistrate to engage in subtle legal analysis before finding probable cause. That is not the magistrate's role and that usually is not necessary to a finding of probable cause. *Cf. Adams v. Williams*, 407 U.S. 143, 149, 92 S.Ct. 1921, 1924–25, 32 L.Ed.2d 612 (1972).

trines require that Namer's conviction be affirmed. Hence, we remand this case to the district court for appropriate findings and conclusions on whether these doctrines apply or whether Namer must be retried.

### III

We hold today only that the search warrant application presented to the Louisiana magistrate, when purged of material, reckless misrepresentations, would not provide probable cause to believe that Namer had violated the law.[20] Accordingly, we reverse and remand to the district court with directions to conduct further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

### APPENDIX A

The search warrant application, signed by James Dall of the New Orleans Department of Police, contained the following statement of "reasons and facts for the request[ed]" search warrant:

> An investigation by Assistant District Attorney Pauline Hardin, Assistant District Attorney Robert Barnard, and New Orleans Police Department Officer James Dall of the Economic Crime Unit of the Orleans Parish District Attorney's Office reveal that National Financial Management Services, Inc., d/b/a Financial Management Services and David Namer, did engage in the selling of and offer to sell unregistered securities to various persons in Orleans Parish, Louisiana, in willful violation of Louisiana Revised Statute 51:706(A) and Louisiana Revised Statute 51:710, and that in the course of this investigation one Mitchell Heller, a client or customer of National Financial Management Services, Inc., d/b/a Financial Management Services and David Namer, has informed the Orleans Parish District Attorney's Office that he gave twenty-five thousand dollars ($25,000) by check to David Namer on or in the premises described above in Orleans Parish, Louisiana, on September 12, 1977, as an advanced fee on an application for a loan commitment as requested by David Namer and that Mitchell Heller was in the same offices of David Namer, National

> Financial Management Services, Inc., d/b/a Financial Management Services, at noon on October 27, 1977, at which time he did personally observe some of the above described property including an approved loan commitment on or in these premises in the custody and possession of David Namer, and that Harry Stansbury, Deputy Commissioner of Louisiana Securities Commission has advised the Orleans Parish District Attorney's Office that the offerings being made by National Financial Management Services, Inc., d/b/a Financial Management Services and David Namer, including the transactions with Mitchell Heller, are classified as securities and the official records of the Louisiana Securities Commission reveal that these offerings are not registered with them and that David Namer is not a licensed broker-dealer as required by law.

### APPENDIX B

The search warrant issued by the magistrate authorized a search of Namer's offices for:

> All loan commitment applications, loan commitments, corporate records, records of corporate minutes, stock register books, stock certificates, bank records of corporation and David Namer personally, telephone company statements for period September 1, 1976 to November 3, 1977, financial records of any audits, all correspondence to or from any clients, customers and investors or any prospective clients, customers and investors, records of any escrow accounts, all of the above of National Financial Management Services, Inc., and/or Financial Management Services and David Namer.

### ON PETITION FOR REHEARING

Before CLARK, Chief Judge, GEE and GARWOOD, Circuit Judges.

**PER CURIAM:**

The Petition for Rehearing, 680 F.2d 1088, on behalf of the United States obviously misses the thrust of our opinion in asserting that we questioned the integrity of Assistant United States Attorney Pauline Hardin. This is incorrect.

---

**20.** Due to our disposition on this ground, we do not have occasion to decide whether the warrant also offends the particularity clause of the fourth amendment. Likewise, we defer consideration of Namer's collateral estoppel claim.

The crucial phrase in the affidavit in issue characterized Deputy Securities Commissioner Stansbury's ad hoc, oral opinion as a "classification." We held that this was an improper characterization of Stansbury's comments, which was so vitally material to the substance of the affidavit that misrepresentation would amount to reckless disregard for truth. *In the alternative*, we held that if the characterization was intended to convey no more than Stansbury's informal feelings about the security status of loan commitments, the affidavit was legally insufficient to support the warrant. Thus, it can be seen that we did not decide which characterization had been intended since neither would carry the point.

The court writes further solely to make clear that Ms. Hardin's integrity was not necessarily implicated in our decision cast, as it was, in the alternative. Certainly her integrity was not impugned.