**UNITED STATES of America**

v.

**Frank WAXMAN.**

**Crim. No. 83–101.**

United States District Court,
E.D. Pennsylvania.

Oct. 4, 1983.

John Rogers Carroll, Carroll & Carroll, Philadelphia, Pa., for defendant.

Peter Schenck, Deputy Chief, U.S. Atty., and Mary C. Spearing, Asst. U.S. Atty., Philadelphia, Pa., for government.

## OPINION

DITTER, District Judge.

In this criminal matter, defendant has moved to suppress his statement given to law enforcement officers and 172 art objects seized from his residence during the execution of a search warrant and subsequent occupation order.[1] At an evidentiary

---

1. The occupation order was issued by the Philadelphia Municipal Court upon application of

Detective John Gallo of the Philadelphia Police Department. The court order authorized the

hearing on the motion, 10 witnesses testified. In addition, counsel have submitted numerous exhibits and lengthy memoranda. After careful consideration of the evidence and the arguments of counsel, I conclude defendant's motion must be granted in part and denied in part for the reasons which follow.

*Background*

On April 2, 1982, Philadelphia and Los Angeles law enforcement authorities executed a search warrant at the Philadelphia residence of Dr. Frank Waxman describing three art objects which had been stolen from Los Angeles art galleries in December, 1981. During the course of the search, 172 art objects, including the ones described in the warrant, were seized. That same day, Dr. Waxman voluntarily submitted to arrest on Los Angeles and Philadelphia charges. Late on April 2 into the early hours of April 3, 1982, Dr. Waxman gave a statement to police confessing to the Los Angeles thefts[2] and describing his sources and methods of payment for the other art objects at his residence.

In addition to being charged with Pennsylvania and California state crimes, Dr. Waxman eventually was charged by a federal grand jury with seven counts of interstate transportation of stolen property[3] and 22 counts of receiving stolen property in interstate commerce.[4] Defendant's motion to suppress, which is the subject of this opinion, was filed only with regard to the federal charges.[5]

*Probable Cause to Search*

Defendant launches a multi-pronged attack at the sufficiency of the affidavit supporting the search warrant and the investigatory techniques which generated his identification by two persons employed in the Los Angeles art galleries. Specifically, defendant first contends the affidavit is riddled with material false statements, includes tainted evidence, omits evidence weighing against probable cause, contains stale information, and lacks information linking the stolen Los Angeles art objects to defendant's Philadelphia residence. Then, he suggests that because his picture was the only one shown to the witnesses, their identification resulted from an overly suggestive and coercive technique and thus is tainted. Defendant concludes by arguing that when the tainted statements are removed from the affidavit, the remaining information is insufficient to establish probable cause to search his residence. I disagree with defendant that certain statements must be stricken from the affidavit and conclude it established probable cause to search.

*Facts*

In late December, 1981, three art galleries in similar locations in Los Angeles, California, fell victim to thefts of small modern art objects: 1) on December 23, a collage box by Joseph Cornell was stolen from the Corcoran gallery; 2) on December 24, a sculpture by Pablo Picasso was stolen from the Palmer gallery; and 3) on December 26, a sculpture of a hand by August Rodin was stolen from the Feingarten gallery. The personnel at each gallery described their suspect as a white male of medium height, slight build, and dark hair and eyes.[6] They

---

Philadelphia Police Department to occupy and control the residence from April 2 to April 7, 1982, "to complete the search, seizure and inventory as authorized by [the] Search Warrant . . . ." Ex. ——. The order also prohibited defendant or his agents from entering the residence, unless authorized to do so in writing, during the same time period.

2. He also confessed to having committed a theft from a New York gallery.

3. 18 U.S.C. § 2314 (1970).

4. 18 U.S.C. § 2315 (1970).

5. I decline to comment on the affect, if any, of my ruling on defendant's motion on either the Pennsylvania or California charges.

6. While defendant is correct that the gallery personnel gave different descriptions of him, the descriptions were quite similar: 1) Gail Feingarten of the Feingarten gallery described her suspect as being 5'7", white male, 125–135 lbs., age 30, dark shaggy hair and eyes, a stubble, and wearing tennis clothes; 2) Curt Klebaum of the Corcoran gallery described the suspect as white male, prominent nose, dark hair and eyes, 5'10", 140 lbs., and wearing a yellow windbreaker and jeans; and 3) Stephanie Habif

further described him as casually dressed, clutching a plastic bag, and interested in modern art. In two of the galleries, the suspect had represented he was Mr. Hurst. Detective Don Riggio of the Los Angeles police department, who was assigned to investigate the thefts, eventually uncovered the name Frank Waxman.[7] Riggio contacted Dr. Waxman by telephone in Florida to discuss the thefts. Having learned that Dr. Waxman resided in Philadelphia, Riggio, in January, 1982, contacted the Philadelphia police department and requested a photograph and the prior record of Waxman. The matter was assigned to Detective John Gallo. In February, 1982, Gallo sent to Riggio photocopies of 3 photographs of Dr. Waxman from his medical school yearbook.[8]

Desiring to display Dr. Waxman's picture to the gallery personnel, Riggio tried to gather pictures of other persons of like description to produce a photo array. Detective Riggio testified he failed in this effort, however, because the photographs of Dr. Waxman were larger than the photographs in the Los Angeles police department collection and the dress of Waxman, a white coat in one photograph and a stethoscope in another, could not be matched. Acting on advice from a Los Angeles district attorney, in late February, 1982, Riggio displayed only the photographs of Waxman to the gallery personnel.[9] Gail Feingarten of the Feingarten gallery stated she was 85 percent sure one of the photographs was the person who had been in her gallery just before the Rodin hand was missed. Similarly, Curt Klebaum of the Corcoran gallery immediately identified the photograph of Waxman in which he is wearing a white jacket and a wide tie.

Additional investigation by Riggio revealed Dr. Waxman was an avid art collector and that within the previous two years he had been seen in possession of a collage box by Joseph Cornell. An expert at the Smithsonian Institute informed Riggio that most owners of the boxes register them and Dr. Waxman was not a registered owner.

In late March, 1982, Detective Riggio travelled to Philadelphia to discuss the results of his investigation and to obtain a search warrant for Dr. Waxman's residence in Philadelphia. First, Riggio met with Detective Gallo and Sergeant James Burke to discuss the results of Riggio's investigation. At this meeting, Riggio also told Gallo and Burke of the single person identification procedure performed in California. Additionally, Sergeant Burke requested that Riggio secure a California arrest warrant for Dr. Waxman because, in his view, its existence would make it easier to obtain a search warrant for Waxman's residence. On April 1, 1982, Detective Gallo swore out an affidavit in support of an application for a search warrant reflecting the results of Riggio's investigation. The search warrant issued on April 1, 1982, and was executed at approximately 7:00 A.M. on April 2, 1982.

*Photo Identifications*

██ Defendant first contends the identification procedure used by Detective Riggio was unconstitutional and thus, the identifications of defendant unconstitutionally obtained. Citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the defendant argues the statements in the affidavit regarding the identifications must be stricken. Defendant maintains without said statements the affidavit is insufficient to establish probable

---

of the Palmer gallery described the suspect as being 5′7″ to 5′8″, small frame, and dark brown hair and eyes.

7. A telephone number supplied by Gail Feingarten to Detective Riggio led to Barry Tischler, the person with whom Dr. Waxman stayed in Los Angeles around Christmas, 1981. Tischler's description of Dr. Waxman essentially matched that given the suspect by the gallery personnel.

8. Gallo testified that the Pennsylvania state authorities refused to provide him with Waxman's driver's license photograph. Gallo further stated that numerous surveillance attempts of Waxman failed.

9. Riggio testified the district attorney opined this procedure was lawful if Riggio explained to the witnesses that because only one person is depicted does not mean he was guilty or even suspected by police. Riggio stated he followed the instructions of the district attorney.

cause. While I agree that the identification procedures used by Riggio were overly suggestive and coercive, because the identifications themselves were reliable, defendant's constitutional rights have not been violated. Therefore, the identification statements should not be stricken from the affidavit.

In *Wong Sun,* the Supreme Court held that unlawfully obtained evidence cannot be used to establish probable cause for an arrest warrant. 371 U.S. at 484–85, 83 S.Ct. at 416. The holding applies equally to evidence used in support of a search warrant. When the latter situation arises, the "ultimate inquiry on a motion to suppress ... is ... whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause. *United States v. Giordano,* 416 U.S. 505, 555, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part). Accord: *United States v. Lace,* 669 F.2d 46 (2d Cir.1982); *United States v. Marchand,* 564 F.2d 983 (2d Cir.1977) *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978). Thus, the focus of my inquiry must be whether the identification allegations are tainted; stated more simply, whether the evidence supporting said allegations was unlawfully obtained.

In *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court rejected as overly harsh a per se rule requiring exclusion of all evidence gained from an unnecessary and suggestive single photo identification. *Id.* at 104, 97 S.Ct. at 2247. Rather, the Court said the central inquiry is whether under the totality of the circumstances, the identification

was reliable even though the confrontation procedure was suggestive.[10] *Id.* at 106, 97 S.Ct. at 2248. If the identification possesses sufficient aspects of reliability, the defendant's due process rights have not been violated. *Id.* In making its reliability determination, a court must examine the witness' opportunity to view, degree of attention, accuracy of description, and level of certainty. *Neil v. Biggers,* 409 U.S. 188, 197–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972). The court also must examine the conditions of the view and the time lapse between the crime and the confrontation. *Id.* The court then must weigh the reliability factors against the corrupting effect of the suggestive identification procedure and determine whether the totality of the circumstances gives rise to a very substantial likelihood of irreparable misidentification. *Manson v. Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253; *Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247 (1968).

While the single photo identification procedure used here was unnecessary[11] and suggestive, *Simmons v. United States, supra; Government of Virgin Islands v. Petersen,* 553 F.2d 324 (3d Cir.1977); *United States v. Higginbotham,* 539 F.2d 17, 23 (9th Cir.1976), I conclude the identifications were reliable. Taking Mrs. Feingarten first, she possessed a good opportunity to see and paid a high degree of attention to the man in her gallery on December 26. He was in her presence for 45 minutes to an hour. They were alone. They talked. The lighting was good and they were close to each other because she was showing him

**10.** The *Manson* court appeared to reject the notion that different rules exist for pre-trial identification and in court identification. *Manson v. Brathwaite, supra,* 432 U.S. 98, 106 n. 9, 97 S.Ct. 2243, 2249 n. 9.

**11.** Because evidence was presented on this point, I will comment on whether the procedures here were unnecessary. I conclude they were. While Detective Riggio testified the photos of defendant were larger than those in the Los Angeles Police Department collection and he had no pictures of persons with stethoscopes, the record reveals Detective Riggio did

not exhaust sufficient avenues to locate similar photos. Without attempting to set out specific guidelines, I merely note that Riggio did not go outside the department to search for similar photos, look for persons resembling defendant to photograph, search yearbooks of Los Angeles area medical schools for pictures of persons with stethoscopes, or enlarge any smaller pictures he located which may have been appropriate for use in a proper photo array. In short, because Detective Riggio did little to overcome his dilemma, the procedures he used were unnecessary.

various art objects. She was concentrating on him and their conversation and was not distracted by other people or other events. Next, her physical description of the man in her gallery matches that of defendant. Third, her identification was certain despite the fact that she was not 100 percent sure the man in her gallery was depicted in the photographs. While absolute certainty of an identification is ideal, it is unnecessary during the investigative stage. Rather, law enforcement officers must deal with *probabilities*. Here, where Mrs. Feingarten stated she was 85 percent sure, the certainty of her identification easily is established. Additionally, when it is kept in mind that 10 year old photographs were the basis of her identification, her statement supports the conclusion that her identification was certain. Finally, Mrs. Feingarten's identification occurred approximately two months after the crime. That Riggio may have told Mrs. Feingarten the man pictured in the photograph was a suspect is of no consequence because that suggestion, if made, was not until after Mrs. Feingarten positively identified the photograph.

With the exception of time spent together, Curt Klebaum's opportunity to observe the man in the Corcoran gallery and Klebaum's degree of concentration on the man's features, were nearly identical to Mrs. Feingarten's. Mr. Klebaum, however, was with the man for only 15 minutes. As with Mrs. Feingarten, Mr. Klebaum's description of the man in the gallery matches that of defendant. Also, when shown the photographs, Mr. Klebaum immediately identified one as being the man in the gallery. Therefore, his identification was positive and certain.[12] Finally, Mr. Klebaum's identification occurred approximately two months after the crime. Considering all the circumstances, I cannot conclude there was a very substantial likelihood that either Mrs. Feingarten or Mr. Klebaum misidenti-

fied defendant. Both Mrs. Feingarten and Mr. Klebaum had an extensive opportunity to see the man under conditions of uninterrupted concentration. Additionally, there was little likelihood of confusing that customer with another: the man was Mrs. Feingarten's only customer that day and Mr. Klebaum's first. In both instances the fact that a theft had occurred was discovered immediately. Within hours of the events, Mrs. Feingarten and Mr. Klebaum were required to concentrate on recalling and describing the man whom they considered to be the thief. Both appeared as witnesses before me and both impressed me as being credible, sincere individuals who would be careful in supplying information and who would try to be accurate in making an identification. I consider it unlikely that either Mrs. Feingarten or Mr. Klebaum would be influenced by the fact that only the pictures of one individual were shown or that either would identify someone in a picture with a greater degree of certainty than was appropriate. This is borne out by what they said. Mrs. Feingarten told Detective Riggio the photographs looked very much like the man who had been in the gallery but she was not 100 percent sure. Mr. Klebaum said that one of the photos of the defendant resembled the man with whom he had dealt, but the other two pictures did not. Mr. Klebaum added that for all he knew, the other two pictures could be of someone else.

The only circumstances supporting the possibility of misidentification are the approximately two months which elapsed between the crime and the showing of the pictures to the witnesses and whatever suggestiveness there may have been in the photographic identification. Both of these factors are less important here than in many cases because of the length of time both witnesses were with the thief, their degrees of concentration, the nature of the

---

12. Defendant argues Klebaum's identification was uncertain because he stated the two remaining photographs, both of defendant, did not resemble the man in the gallery. This argument is without merit. First, the fact of the matter is that Klebaum *immediately* identified one photograph of defendant. Why he reacted in such a way to one and not the others is unclear and unimportant. Next, Klebaum also stated the other photographs did not resemble the man in the gallery *as much as* the photograph he identified.

events, and the credibility which I afford to these witnesses. These were audacious, significant crimes which by their very nature would create lasting impressions. For all these reasons, therefore, I conclude the identifications were reliable and there was not a very substantial likelihood of irreparable misidentification.[13] *Manson v. Brathwaite, supra; Simmons v. United States, supra.* Accordingly, the identifications were not unlawfully obtained and the statements in the affidavit regarding them should not be stricken. Defendant's motion on this ground must be refused.

*Material False Statements and Omissions in Search Warrant Affidavit*

■ Defendant next contends Detective Gallo deliberately omitted material facts and misstated others in his affidavit supporting the search warrant. The alleged falsehoods and omissions in the affidavit were that: 1) witnesses identified defendant as the thief when in fact they only said defendant was in their galleries on the days of the thefts; 2) *all* Cornell boxes were registered when in fact the investigation revealed only *most* were registered; 3) there was no statement that the identifications were based on a single photograph display; 4) there was no statement as to the extremely tentative nature of the identifications by Mr. Klebaum and Mrs. Feingarten; and 5) there was no statement that Detective Riggio spoke with defendant by telephone shortly after the crime. Defendant asserts that having shown the existence of the above falsehoods and omissions, it is evident probable cause to search defendant's residence was lacking.[14] Because I have determined that the highlighted statements in the affidavit either were not false or, if so, were immaterial, the magistrate's conclusion regarding probable cause will not be disturbed.

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. at 2676–77 (1978). "While *Franks* dealt with misstatements, . . . [courts have] recognized that allegations of material omissions . . . [are] to be treated essentially similarly to claims of material misstate-

---

**13.** While it plays no part in this analysis, I note that both Mrs. Feingarten and Mr. Klebaum independently identified the defendant. This occurred at both the California hearing and the hearing over which I presided. To paraphrase Mr. Justice Blackmun, my "assurance as to the reliability of the [photographic] identification[s] is hardly undermined" by these later identifications and by the results of the subsequent search of defendant's apartment. *See Manson v. Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2253.

**14.** Throughout his post-hearing brief, defendant speaks in terms of having made a "substantial showing of falsehood" so as to mandate a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1977). I do not agree that defendant has made such a showing, nor do I agree a further hearing is necessary or would be productive. Before the suppression hearing, defendant's argument regarding the falsehoods was centered solely on the alleged misstatements concerning the identification of defendant as the thief. As the hearing unfolded, defendant bolstered his position by alleging an additional falsity and various omissions. Testifying at the hearing, *inter alia,* were Detective Gallo, the affiant, Detective Riggio, the supplier of information, and the witnesses who identified defendant. Thus, all persons necessary to defendant's inquiry were present and subject to cross examination. In fact, defendant cross examined each witness vigorously on his statements and state of mind. Having already gone through the exercise I fail to see, and defendant has not suggested, the purpose of an additional hearing.

ments." *United States v. Martin,* 615 F.2d 318, 328 (5th Cir.1980) (citation omitted); see *United States v. Seta,* 669 F.2d 400, 402 (6th Cir.1982) (per curiam). If defendant establishes that the omissions were made intentionally or with reckless disregard for the accuracy of the affidavit, the court must determine whether if the omitted material had been included in the affidavit, the affidavit still would establish probable cause to search. *United States v. Martin, supra.*

### Deliberate Falsities

Defendant first argues the statement in the affidavit that two witnesses identified him as the thief was materially false and deliberately or recklessly included in the affidavit. I disagree. Contrary to defendant's argument, the affidavit here is unlike the one in *United States v. Namer,* 680 F.2d 1088 (5th Cir.1982) where a slight misstatement in the warrant affidavit made all the difference in the world in terms of establishing probable cause. In *Namer,* the defendant was dealing in loan commitments and loan commitment applications. The investigating team, unsure of whether the loan instruments were securities and thus governed by certain securities laws, solicited the off the record opinion of a state official on the subject. The official *opined* that the instruments *probably* were securities. The affidavit in support of the search warrant for defendant's office, however, stated the official had said that the instruments *were classified as* securities. *United States v. Namer, supra,* 680 F.2d at 1090–91. The Court of Appeals for the Fifth Circuit, commenting on the nature of the falsity stated:

> The word "classified" connotes the authoritative result of ordered procedures and methodologies, not an ad hoc and qualified oral opinion of a single agency employee. The affidavit's statement is no less a misrepresentation because it manipulates the facts subtly. By using the word "classified," the affiant inaccurately described what had transpired. Since the statement that the instruments were "classified as securities" was the only

item in the affidavit tending to establish that Namer had acted criminally, we also conclude that the misrepresentation was material.

*United States v. Namer, supra,* 680 F.2d at 1094. In short, the troubling nature of the *Namer* affidavit statement was that it bore no relation to what actually had occurred during the investigation. Here, however, the affidavit statement was the only possible inference to be drawn from the circumstances related by the witnesses. It is undisputed that Mr. Klebaum and Mrs. Feingarten each identified defendant as "the man" or "Mr. Hurst," the assumed name which defendant used in two of the galleries. It is equally clear that neither Mrs. Feingarten nor Mr. Klebaum actually saw defendant take any art object. These facts, however, do not mean the statement in the affidavit was false. Rather, the circumstances of the thefts supports the conclusion that the statement in the affidavit was, at most a summary, a characterization of the witnesses' statements. In both the Feingarten and Corcoran galleries, the man identified was the only customer present immediately prior to the art objects having been discovered missing. In fact, he was the only customer that day at the Feingarten gallery and the first customer at the Corcoran gallery. In both galleries, art objects were noticed missing immediately following the man's departure. The statement in the affidavit is the only logical inference to be drawn from the identification statements and surrounding circumstances of the incidents. In fact, Mrs. Feingarten even testified that while she never said the man she identified was the thief, she certainly thought he was. This same inference can be drawn from Mr. Klebaum's testimony. Unquestionably, had all the details of the crime and the precise identification statements of Mrs. Feingarten and Mr. Klebaum been set forth in the warrant affidavit, the Magistrate could have reached only one conclusion: defendant was the thief. For these reasons, Detective Gallo's affidavit was not false. There was no deliberate or reckless disregard for the truth.

The identification statement will not be stricken.

Next, defendant asserts the affidavit statement regarding the results of the investigation at the Smithsonian Institute was false. During his investigation, Detective Riggio contacted a modern art expert at the Smithsonian Institute to determine whether defendant was a registered owner of a Cornell Box. The Smithsonian reported that *most* Cornell Boxes were registered, that defendant was not a registered owner, and therefore, he should not possess a box legitimately. The warrant affidavit, however, states, "[f]urther checks with modern art experts at the Smithsonian Institute in Washington reveal that Waxman is not a registered owner of a Cornell Box, said boxes being very rare and valuable *each* being registered."

While I agree that the statement in the affidavit is erroneous, it will not be stricken because it was not material to probable cause and not made deliberately or with reckless disregard for the truth. While there is a great difference between the registration of *most* rather than *every* Cornell Box, the difference under the circumstances here had *no* bearing on whether probable cause existed to search defendant's residence. Therefore, the statement was not material.[15] Certainly, if the affidavit statement was correct, defendant's alleged wrongful possession of the Cornell Box would have been established with certainty, and along with the other information, provided a strong inference that defendant had stolen the box. The relevant standard, however, was not whether the affidavit conclusively established defendant to be the thief, but whether under the totality of the circumstances, it was probable that he was. *See Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Therefore, because the term "most" connotes something more than 50 percent,[16]

had the warrant affidavit been accurate as to the percentage of Cornell Boxes registered, a finding that defendant *probably* had stolen the art object still would have been supported. Even if there would have been a bearing on probable cause, the evidence of record indicates the error in the affidavit was at most due to the negligence of Detective Gallo. In fact, until his affidavit statement was brought to his attention, Detective Gallo steadfastly denied he had stated that *each* Cornell Box was registered. Accordingly, for these reasons the affidavit statement regarding the registration of Cornell Boxes will not be stricken from the affidavit.

*Omissions*

As a final *Franks* issue, defendant contends the warrant affidavit was misleading because certain facts uncovered during the investigation were omitted from it. Specifically, defendant argues the affidavit did not mention the tentative nature of the identifications by Mrs. Feingarten and Mr. Klebaum and the suggestive nature of the identification procedure. Additionally, the affidavit makes no mention of Detective Riggio's telephone conversation with defendant while he was in Florida, shortly after the Los Angeles thefts. Because I perceive no error in Detective Gallo's having omitted these things from the affidavit, their omission has no bearing on probable cause.

First, the identifications by Mrs. Feingarten and Mr. Klebaum were not tentative. While Mrs. Feingarten was not 100 percent sure of her identification, she did state that the photographs looked *very much* like "Hurst." In fact, she also testified that she thought the man in the picture was the thief. Thus, it is evident there was nothing tentative about Mrs. Feingarten's identification. As to Mr. Klebaum's identification, he stated that he pointed to one photograph

---

**15.** In Detective Gallo's affidavit it is also stated that defendant possessed a Cornell box prior to the theft from the Corcoran gallery. I reject defendant's contention that this exonerates him. An equally persuasive argument can be made that he has a penchant for Cornell boxes.

**16.** Notwithstanding that "most" can be interpreted as being slightly more than 50 percent, Detectives Riggio and Gallo also described the number of Cornell Boxes registered as the vast majority.

and exclaimed, "that's him." Defendant, however, argues Mr. Klebaum's failure to react similarly to the other two photographs renders the identification tentative. I disagree. What is important is the fact that Mr. Klebaum identified *one* of the photographs, and did so with certainty. His failure to identify the others, perhaps attributable to a myriad of factors such as differences in lighting, facial expression, hairstyle, or clothing, nonetheless, does not detract from the positive identification of one photograph. To suggest that every 10 year old photograph of a person looks as much like him as every other photograph of him that is 10 years old is absurd. Thus, I conclude Mr. Klebaum's photographic identification of defendant was not tentative.

Second, there were no omissions in the affidavit regarding the identification procedure used by Detective Riggio. Defendant's contention that the magistrate should have been made aware of the "overly suggestive" nature of the identification procedure used is meritless and a red herring. Such a statement would have been a legal conclusion from the mouth of a non-lawyer; the conclusion to a question with which courts and legal scholars grapple, reaching no agreement. Thus, to require such a conclusion of a police officer simply is unrealistic. In any event, the affidavit states that "photo's of Frank Waxman ... were shown to the witnesses." It neither states that a photo array was displayed to the witnesses nor misleads the reviewing judicial officer in any respect. Thus, these are not omissions with which I must be concerned.

Lastly, defendant suggests that had Detective Riggio's telephone conversation with defendant in Florida been mentioned in the affidavit, the magistrate would not have concluded it was probable the art objects were located in defendant's Philadelphia residence. Defendant's position has no merit. Again, the determination made by the magistrate in issuing the search warrant was that fruits of a crime *probably* were located in defendant's Philadelphia residence. That defendant may have been in Florida between the thefts and his return home is of little consequence. Defendant's primary residence was in Philadelphia. He had no residence in Florida. He was an art collector, not a dealer. There was nothing to suggest that he stole to sell. The logical inference flowing from these facts is that defendant would put the art where he spent most of his time, not where he has no place of permanent residence. Accordingly, the telephone conversation had no bearing on probable cause.

*Staleness of Information and Connection to Defendant's Residence*

Defendant's final challenge to the validity of the search warrant is that there was no current information in the supporting affidavit to connect the place and time of the thefts with defendant's residence. Specifically, defendant asserts the affidavit is deficient because it describes thefts occurring in California in December, 1981, never places the stolen art objects in defendant's possession during the months which followed, and yet contends that three months later, there was probable cause to search his Philadelphia residence for them. Defendant further argues that statements in the affidavit to the effect he is an art collector and the stolen objects had not yet surfaced in the art community are insufficient to revive the stale information [17] in the affidavit and create a nexus between the art objects and his residence. While I agree "[a] valid search warrant requires current information that the stolen goods are in the place to be searched," Docket Entry 25, Defendant's Memorandum at 11, I disagree with defendant's analysis and conclude de-

---

17. Defendant also contends the information attributed to the Philadelphia Art Museum that defendant possessed a Cornell Box within the previous two years was stale. While I do not agree the information was stale, it did not provide a link in establishing probable cause to search because it raised the inference that de- fendant's possession of a Cornell Box predated the California thefts. There were at least two Cornell boxes found in defendant's apartment and any information about the first has no bearing on the issue of probable cause relating to any theft from the Corcoran gallery.

fendant's motion on this ground is without merit.

An affidavit in support of a search warrant must specify facts explaining "why the items to be searched for . . . [are] expected to be on the . . . premises to be searched." *United States v. Poland,* 659 F.2d 884, 897 (9th Cir.), *cert. denied,* 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981). "The affidavits need not establish beyond a reasonable doubt that the objects sought will be found at the place sought to be searched; it is sufficient that the facts described in the affidavits warrant a reasonable person to believe that the objects sought would be found." *United States v. Green,* 634 F.2d 222, 225 (5th Cir.1981). Moreover, "direct observation [of the objects in the place] . . . [is] not necessary and . . . normal inferences about where criminals would be likely to hide property . . . [are] sufficient, taking into account the type of crime, the nature of the items, and the opportunity for concealment." *United States v. Poland, supra.* It does not follow in all cases, however, that simply from the existence of probable cause to believe a suspect is guilty, there also is probable cause to search his residence. *United States v. Valenzuela,* 596 F.2d 824 (9th Cir.), *cert. denied sub nom., Lizarraga v. United States,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979). Finally, "[i]n marginal cases or in the absence of arbitrariness a magistrate's finding of probable cause should be upheld." *United States v. Green, supra.* As to staleness, the information submitted in support of the search warrant "must be . . . so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case." *Sgro v. United States,* 287 U.S. 206, 210–11, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932). "[W]here some period of time has elapsed since the occurrence of the event detailed in the affidavit, the likelihood that the object will be moved, as well as the length of time since the event occurred, will determine whether probable cause exists." *United States v. Solario,* 577 F.2d 554, 555 (9th Cir.1978).

First, I will address the nexus between the information in the affidavit and defendant's residence. The facts alleged in the affidavit coupled with the nature of the thefts allowed the magistrate to determine there was probable cause to believe the art objects were located in defendant's residence. After setting forth facts raising a reasonable inference that the same person committed the three Los Angeles thefts, the affidavit stated that defendant was a collector of art, that each of the stolen items was rare, unique, and valuable, and that the items had not surfaced in the art community and were difficult to sell. The plain theory to connect the objects to defendant's residence obviously was that it is likely an art collector would store or display artwork in a place where he most often could appreciate it, his primary residence. This inference is strengthened by the fact the affidavit communicated to the magistrate that these particular objects could be transported easily due to their size. Thus, "the facts described in the affidavit[ ] warrant a reasonable person to believe . . . the objects sought would be found" in defendant's residence. *United States v. Green, supra,* 634 F.2d at 225; *United States v. Rahn,* 511 F.2d 290 (10th Cir.1975). The circumstances here are unlike those in *United States v. Green, supra,* where the nature and quantity of the materials searched for made it unlikely they would be transported from California to Florida. In any event, while I do not consider this a marginal case, because the inference that the art objects probably would be found in defendant's residence is clear and there is no evidence of arbitrariness by the magistrate, I will uphold his finding of probable cause. *United States v. Green, supra.*

As to defendant's staleness argument, the same facts compel me to agree with the magistrate's finding. While the time lapse between the Los Angeles crimes and the search was approximately 100 days, the circumstances made it probable the objects would have been taken to defendant's residence and it was unlikely they would have been moved. The objects here were not of

the type which are disposed of or sold rapidly like drugs, credit cards, counterfeit bills, and automotive parts. Thus, the cases cited by defendant are distinguishable. Finally, the nature of the objects coupled with defendant's status as an art collector leads to the inference that it was unlikely defendant had disposed of them. Accordingly, the lapse of time between the crimes and the search did not defeat probable cause.

In summary, the affidavit supporting the search warrant was sufficient to establish probable cause to search defendant's residence: 1) while the identification procedure may have been improper, the identifications were reliable; 2) there were no deliberate or reckless material falsehoods or omissions in the affidavit; and 3) the facts alleged in the affidavit were neither remote in time or place to the search.

*Execution of the Search Warrant*

█ Defendant contends the searching officers exceeded the scope of the warrant by occupying his residence for five days and seizing 172 art objects. The government's justification for the mass seizure is that the items not mentioned in the search warrant were properly seized pursuant to the plain view doctrine. For the reasons which follow, I conclude that while some of the art objects were seized lawfully, the vast majority were not, and thus, they will be suppressed.

On either March 30 or 31, 1982, Detectives Riggio and Gallo, Sergeant James Burke, and William F. Smith, a fine arts insurance adjuster, met in Philadelphia to discuss the investigation of Dr. Waxman and the possibility that Waxman may have been involved in thefts of other art objects. At that meeting, Mr. Smith showed the officers photographs depicting and flyers describing stolen art. At approximately 7:15 A.M. on April 2, 1982, Detectives Riggio and Gallo, and Sergeant Burke, accompanied by other officers, executed the search warrant. Upon their entry to de-

fendant's residence, they discovered it was filled with modern art. Within five minutes, the Cornell Box from the Corcoran gallery and the Picasso statuette from the Palmer gallery were found. The Rodin hand from the Feingarten gallery could not be located, but the officers recognized objects about which Mr. Smith had spoken. Soon thereafter, the searching officers telephoned Mr. Smith to invite him to the scene. They also telephoned Special Agent Bazin of the FBI, an art expert, and Chief Richard Viola of the Bensalem police department, who formerly had been in charge of art thefts for the Philadelphia police department. As with Mr. Smith, the officers invited Special Agent Bazin and Chief Viola to the scene of the search because of their expertise in art. While Smith, Bazin, and Viola arrived at the residence at various times that morning, upon arrival, each was astounded and overwhelmed by the quantity of art there. Immediately, each recognized various objects, both those identified by Detective Gallo and numerous others, as having been reported stolen. Mr. Smith [18] then proceeded to telephone various art galleries throughout the United States to verify his suspicions that the residence contained numerous stolen art objects. Eventually, in response to a telephone call from Smith, Hope Mackler of the Mackler gallery in Philadelphia arrived and identified several objects stolen from her gallery. Finally, late on April 2, 1983, the officers sought and obtained a court order from the Philadelphia Municipal Court allowing them to occupy the residence for the purpose of inventorying the art objects, verifying that they were stolen, and packaging them for transport to storage at the Philadelphia Art Museum. When the search was completed, approximately 172 objects were seized.

The Fourth Amendment of the United States Constitution prohibits warrantless, unreasonable searches and seizures. See *Kremen v. United States,* 353 U.S. 346, 77

---

18. Mr. Smith identified as stolen the following items: two Archipenko sculptures; the untitled Franz Kline oil painting; a collage box by Joseph Cornell; sculptures by Henry Moore; three paintings by Andy Warhol; three mobiles, a drawing, and a painting entitled "Splotchy" by Alexander Calder; drawings by Hoffman and Avery; and sculptures by Trova.

S.Ct. 828, 1 L.Ed.2d 876 (1957). Numerous exceptions to the warrant requirement have been established by courts. One so-called "exception" [19] is the plain view doctrine. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

In the *Coolidge* plurality's view, the "plain view" doctrine permits the warrantless seizure by police of private possessions where three requirements are satisfied. First, the police officer must lawfully make an "initial intrusion" or otherwise properly be in a position from which he can view a particular area. Second, the officer must discover incriminating evidence "inadvertently," which is to say, he may not "know in advance the location of [certain] evidence and intend to seize it," relying on the plain view doctrine only as a pretext. Finally, it must be "immediately apparent" to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.

*Texas v. Brown,* —— U.S. ——, ——, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983). (citations and footnote omitted). Recently, in *Texas v. Brown, supra,* the Supreme Court summarized the principle behind the plain view doctrine stating, "our decisions have come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." *Id.* at 1541. Additionally, the Court refined the requirement in *Coolidge* that the incriminating nature of the item seized be "immediately apparent" to a standard equal to probable cause. *Id.* at 1542–43. Accord: *United States v. Scarfo,* 685 F.2d 842, 854–55 (3d Cir.1982) (Gibbons, J., dissenting). In any event, it is clear the "immediately apparent" requirement amounts to more than a mere suspicion on the part of an officer that the item to be seized is of an

incriminating nature. *United States v. Scarfo, supra.*

Here, the search warrant executed at defendant's residence described only three art objects to be seized: the Picasso statuette; a Cornell box; and the Rodin hand. Thus, for the remaining art objects to have been seized lawfully, some exception to the warrant requirement, in this case the plain view doctrine, must apply. Based on a careful review of the circumstances, I conclude that some of the items properly were seized and some were not. First, as explained in pages 1138 to 1147 of this opinion, because the search warrant affidavit was sufficient to establish probable cause, the police officers were on the premises lawfully. Second, with the exception of some Pistoletto prints,[20] the objects were discovered inadvertently. While the officers may have *suspected* that other art objects would be situated on the premises, they had no knowledge as to the presence of specific objects, and thus they were not using the search warrant as subterfuge to seize items not described therein. See *Coolidge v. New Hampshire, supra,* 403 U.S. at 471–72, 91 S.Ct. at 2040–41. Accordingly, the focus of my analysis is on whether the incriminating nature of the art objects seized was "immediately apparent" to the officers. In short, did the officers have probable cause to seize the objects? *United States v. Scarfo, supra.*

It is clear that as to certain objects not described in the warrant, the officers had probable cause to believe they were stolen and thus, seizure was proper. For example, because of their meeting of March 30 or 31, 1982, with Mr. Smith, the officers immediately recognized the following as having been reported as stolen: the untitled Franz Kline oil painting, two sculptures by Archipenko, and a collage box by Joseph Cornell. As to them, Mr. Smith had shown the offi-

---

**19.** In *Texas v. Brown,* —— U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), the Supreme Court stated that when the item seized in plain view is situated on private premises, " '[p]lain view' is ... better understood ... not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justi-

fication for an officer's 'access to an object' may be." *Id.* at 1540–41.

**20.** The prints were situated underneath a bed wrapped in a white sheet. This alone is sufficient to cause these items to be suppressed.

cers and briefed the officers regarding their descriptions. See *Petition of Becker,* 515 F.Supp. 1193, 1197 (D.Kan.1981). Additionally, because Detective Gallo had examined his own files before he went to the apartment, he recognized certain objects which had been reported as stolen: a drawing by DeKooning, a "flashlight" by Jasper Johns, a painting entitled "Splotchy," two paintings by Andy Warhol, sculptures by Archipenko, a collage box by Joseph Cornell, and a construction box.

Thus, when the ... [officers] seized articles which fit the descriptions of stolen art objects, they were acting with reasonable cause to believe that the items were evidence of a crime.

Accordingly, ... [I] find that the[se] seized articles not listed in the search warrant were incriminating objects which came into plain view of the ... [officers] who were executing a valid search warrant.

*Petition of Becker, supra.*

The other objects were seized improperly, however, because the officers did not have probable cause to believe they were stolen. Additionally, the objects recognized as stolen by Mr. Smith, and Mrs. Mackler were seized unlawfully because they were on the premises improperly.[21]

Of the 169 objects seized without a warrant, testimony was received regarding approximately 25 of them. The only testimony received as to the remaining objects was from various of the officers that because they believed some of the things were stolen (the 25 objects referred to previously), they thought the others might be stolen as well. Therefore, it is clear that, at best, the officers merely had a suspicion these items were stolen rather than probable cause to believe so. They neither recognized the specific pieces nor based their decision to seize them on any evidence other than the fact that some objects were believed to be stolen. Under these circumstances, I can-

not conclude there was probable cause to seize these objects and thus, they must be suppressed. While *United States v. Wolfe,* 375 F.Supp. 949 (E.D.Pa.1974), establishes a lesser standard than probable cause for plain view seizure when the items seized "have a reasonable relation to the purpose of the search," *Wolfe* no longer may be correct in light of *United States v. Scarfo* and *Texas v. Brown* both of which speak in terms of probable cause. Accordingly, if *Wolfe* at one time would have justified the seizure of these objects, I conclude it no longer does so.

The objects recognized *only* by Mr. Smith, and Mrs. Mackler also must be suppressed. The law is clear that officers cannot accompany other officers, who are executing a valid search warrant, to conduct an unauthorized general search for incriminating articles. *Byars v. United States,* 273 U.S. 28, 32, 47 S.Ct. 248, 249, 71 L.Ed. 520 (1927); *United States v. Sanchez,* 509 F.2d 886, 889 (6th Cir.1975); *United States v. Tranquillo,* 330 F.Supp. 871 (M.D.Fla.1971). Under certain circumstances, however, private persons who are victims of the crime or analagous to victims, may accompany officers executing a valid search warrant. *Commonwealth v. Farrar,* 271 Pa.Super. 434, 413 A.2d 1094 (1979) (sister of victim); *People v. Superior Court of Marin County,* 25 Cal.3d 67, 157 Cal.Rptr. 716, 598 P.2d 877 (1979) (en banc) (victim). The situation here, however, is distinguishable from the circumstances under which private persons may participate in an authorized search. Mr. Smith was not a victim of the crimes for which the search was being conducted nor was he analogous to being a victim. Rather, he was invited to participate in the search solely because the officers knew him to be an art expert capable of determining whether some or all of the pieces in defendant's residence were stolen. Mr. Smith had suffered no loss when he entered the prem-

**21.** I need not determine whether objects recognized as stolen by Agent Bazin and Chief Viola were seized properly. First, there is no evidence on the record that Agent Bazin recognized any of the objects. Second, the object recognized by Chief Viola, the painting entitled "Splotchy," already had been recognized by Detective Gallo. I also need not determine whether the order allowing the police to occupy the residence was proper.

ises. Perhaps had he been invited to participate to verify that the objects seized pursuant to the warrant were in fact those objects or to verify the stolen nature of the other objects *already* recognized as such by the officers, his recognition of other objects as stolen and their seizure would have been proper. This, however, is not the situation before me as neither the officers nor Mr. Smith testified that he was invited to the scene to verify objects as stolen. While Mrs. Mackler was a victim of a theft, she was not a victim of the crimes for which the search was being conducted. Thus, she had no connection to the purpose of the search. In any event, her presence at the residence resulted from Mr. Smith's presence and thus, her identification of objects as stolen is tainted. Accordingly, said objects must be suppressed. While I do not suggest that the officers involved here, or any officers for that matter, close their eyes to situations where their suspicions of criminal activity are unverified, there are other safeguards such as photographing the premises and then obtaining a second search warrant which can protect against general exploratory searches and wholesale seizures condemned by courts and the warrant clause to the Constitution. See *United States v. Espinoza,* 641 F.2d 153, 167 (4th Cir.1981) (authorizing photographs of search premises under certain circumstances).

In summary, all art objects seized which neither were described in the search warrant nor identified as stolen by the searching officers must be suppressed.

*Voluntariness of Defendant's Confession*

■ Defendant's final argument is that his statement was involuntarily given because of the drugs he took that day, his borderline personality disorder, and threats of high bail by police. He therefore contends it must be suppressed. Defendant also asserts suppression is required because his confession was the product of an unlawful search and seizure. I disagree and thus, defendant's motion on these grounds must be denied. Some background facts are necessary.

On the day the search warrant was executed, defendant was vacationing in Florida. In response to a telephone call from his wife [22] that police were in their Philadelphia residence, defendant telephoned the residence and spoke with Sergeant Burke. Sergeant Burke informed defendant of the search warrant and advised him to retain an attorney and to return to Philadelphia for arrest. Burke also told defendant that if he did not return, he would be arrested in Florida. After conferring with his Philadelphia attorney, Richard Spivak, Esquire, by telephone, defendant again telephoned his residence to inform the police of the time his flight would reach Philadelphia. When defendant arrived at the airport, he was met by Detectives Riggio and Gallo and Officer Lark, and was arrested as he knew he would be. He was taken to the police substation at the airport and read his *Miranda* rights. He then was driven to his residence. During the ride, he was not asked any questions regarding art or the Los Angeles thefts. The only discussions in the automobile were about the procedure for his release on bail. At approximately 6:00 P.M., defendant and the officers reached his apartment. No questions were asked of defendant while he waited for Mr. Spivak. When Mr. Spivak came, he and defendant conferred privately for approximately 20 to 30 minutes. Shortly thereafter, defendant again was advised of his constitutional rights. When Mr. Spivak informed the police that defendant would not give a statement, Detective Gallo became upset and expressed his intention to handcuff defendant for the drive to the Police Administration Building (PAB). Apparently, defendant was not handcuffed at that time because Sergeant Burke said it was unnecessary. Defendant then was driven to the PAB by Detectives Riggio and Gallo and Sergeant Burke. The officers testified that during the ride, defendant again inquired as to the bail procedure and stated

**22.** Defendant's wife, who also was in Florida, had received a telephone call from defendant's grandmother that the police were in the resi-dence. Apparently, defendant's grandmother telephoned the residence thinking defendant had returned from Florida.

he wanted "to tell the officers what had happened." In response, the officers told him to wait for his attorney before giving a statement. Defendant, however, testified that during the ride to the PAB, the police spoke among themselves of defendant's lack of cooperation and of their intention to handcuff him. Upon hearing this, defendant claims he interjected that he merely was following the instructions of his attorney. Mr. Spivak also went to the PAB, but upon being informed that the arraignment would not take place for two to three hours went to dinner.

At the PAB, defendant was placed in a room at a desk. He neither was handcuffed nor restrained in any fashion. He was free to walk around that area of the building and did so. From 7:30 P.M. to approximately 9:30 P.M., while Mr. Spivak was eating, defendant was not asked any questions. When Mr. Spivak returned to the PAB, he was met outside by Sergeant Burke. At that time, Mr. Spivak and Sergeant Burke engaged in a discussion regarding defendant's situation and the amount of bail to be requested. Essentially, Sergeant Burke stated that because of the value of the art involved, they would ask for bail to be set between $500,000 and $1,000,000, defendant would be incarcerated over the weekend with "animals," and defendant should make a statement. Mr. Spivak told defendant of the substance of the conversation with Sergeant Burke. At this time, defendant expressed his fear of incarceration, discussed the California incidents, and informed Mr. Spivak of the location of the Rodin hand which had not yet been found by the police. Because of defendant's fear of going to jail, Sergeant Burke's characterization of the conditions therein, and an opinion that defendant would not harm his position by speaking, Mr. Spivak advised defendant to give a statement. In return for no recommendation regarding bail and a statement to the judge that defendant was cooperating, Mr. Spivak told the police where the Rodin hand was located and promised defendant would give a full statement after being arraigned.

Just prior to the arraignment, defendant again was advised of his constitutional rights. After bail was set at $50,000, defendant was returned to the custody of Detectives Gallo and Riggio and Sergeant Burke. While Mr. Spivak left defendant's presence to arrange for the posting of bail, defendant, at 12:37 A.M. on April 3, 1982, submitted to interrogation. During the questioning, which lasted until 3:15 A.M., defendant was advised of his constitutional rights numerous times. He was told when his bail was posted. Defendant confessed to the Los Angeles thefts, to one theft in New York, and disclosed the manner and from whom he had purchased the bulk of his art collection. Though defendant contends that during the questioning Agent Bazin threatened him with re-arrest for each item of stolen art, no such threat is reflected in the transcript of the interrogation.

Lurking in the background on the day of the search and defendant's arrest, but unknown to law enforcement authorities, was defendant's drug addiction problem and borderline personality disorder. Defendant testified he has ingested tranquilizers and sleeping pills on a daily basis for almost 20 years and that for the past five to eight years, he had ingested amphetamines each morning to combat the effects of the previous day's tranquilizers. Apparently, defendant relied on these medications to overcome intense feelings of anxiety and depression. Richard F. Limoges, M.D., an expert in addictions and psychiatry, testified that defendant also suffers from a borderline personality disorder characterized by impulsivity, suicidal tendencies, an inability to tolerate loneliness, and poor judgment. Dr. Limoges further stated that while defendant appears to be able to function in society well, he really does so on a superficial basis. Other characteristics of his illness include an intense fear of crowding, confinement, and an expectation that all people intend him harm. Defendant and Dr. Limoges testified that the morning he learned the police were in his residence executing a search warrant, defendant became flooded with anxiety and began in-

gesting inordinate amounts of his medications. Throughout the day, until his supply was exhausted that evening, defendant consumed large quantities of tranquilizers. In fact, he claimed he never had taken more medication on any day in his life.[23] While defendant stated he was not intoxicated from his drug ingestion and understood the events going on around him, Dr. Limoges opined that the drugs affected defendant internally, all of his conduct was motivated by a desire to avoid incarceration, and he did not understand what was happening to him. Thus, Dr. Limoges stated that the combination of defendant's drug intake and personality disorder and the anxiety ridden situation in which he found himself, rendered defendant incapable of making a reasoned decision. In fact, Dr. Limoges stated that to avoid incarceration and custody, defendant would have told the police anything they wanted to hear.

To determine whether a confession was voluntary, all the circumstances surrounding it must be examined. *Davis v. North Carolina,* 384 U.S. 737, 740–42, 86 S.Ct. 1761, 1763–64, 16 L.Ed.2d 895 (1966). See *Mincey v. Arizona,* 437 U.S. 385, 394–97, 98 S.Ct. 2408, 2414–16, 57 L.Ed.2d 290 (1978); *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (consent to search); *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); *Rogers v. Richmond,* 365 U.S. 534, 540, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961). Some significant factors to consider are: 1) whether defendant was advised of his *Miranda* rights; 2) his age and level of intelligence; 3) whether defendant was beaten or threatened with harm; 4) the conditions of defendant's confinement; 5) the types of meals and comforts afforded to defendant; and 6) the length of the interrogation. *Davis v. North Carolina, supra,* 384 U.S. at 740–46, 86 S.Ct. at 1763–67. The focus of the inquiry must not be the truth or falsity of the confession, *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), but "whether the behavior of the

... law enforcement officials was such as to overbear ... [defendant's] will to resist and bring about confessions not freely self-determined ...." *Rogers v. Richmond, supra,* 365 U.S. at 544, 81 S.Ct. at 741. Additionally, statements by law enforcement officials to defendant that his cooperation would be communicated to the court or be exchanged for reduced bail do not, standing alone, render subsequent incriminating statements involuntary. *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978); *United States v. Reed,* 572 F.2d 412, 426 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *United States v. Curtis,* 562 F.2d 1153, 1154 (9th Cir.1977), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978); *United States v. Springer,* 460 F.2d 1344 (7th Cir.), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972); *United States v. Ferrara,* 377 F.2d 16 (2d Cir.1967); *United States v. Morris,* 491 F.Supp. 226 (S.D.Ga.1980). See *United States v. Fisher,* 700 F.2d 780, 782–83 (2d Cir.1983); *United States v. Trafficant,* 558 F.Supp. 993, 995–96 (N.D.Ohio 1983).

After careful consideration of the circumstances, I conclude defendant's statement was voluntary. First, the police officers read defendant his *Miranda* rights numerous times when he was in custody and each time, defendant stated he understood them. Defendant is a man of above average intelligence, was represented by counsel at the time, and despite his drug ingestion and Dr. Limoges' *opinion* of defendant's then condition, defendant and his attorney stated defendant was aware of the situation and was able to function. In fact, defendant stated he was not intoxicated. Because he had been taking drugs for 20 years, he was able "to tolerate very high dosages of medication." Having listened to the recording of the confession I conclude defendant's tone of voice was strong and conversational, his responses clear and coherent, his memory for detail remarkable, and he was not in

---

**23.** Defendant testified, however, that his medication intake on one other day in his life was as great as on April 2, 1982.

fear. He was not abused verbally, physically, or otherwise. The atmosphere was not coercive. While the interrogation was lengthy and went on into the early morning hours of April 3, defendant repeatedly was told he could stop at any time, and when he made that request, the interrogation ceased immediately. Additionally, defendant submitted to questioning for approximately two hours after he knew his bail had been posted. Finally, defendant was not handcuffed during the interrogation and even was given the opportunity to speak with his family. Thus, the *objective* circumstances of defendant's interrogation lead me to conclude his statement was voluntary.

Additionally, I conclude defendant's drug ingestion and personality disorder did not affect the voluntariness of his statement. While I do not question either that defendant consumed a large quantity of tranquilizers on April 2, or that he suffers from a personality disorder as described by Dr. Limoges, I conclude those factors did not play a significant part in defendant's decision to confess. Mr. Spivak, who spoke extensively with him, said the defendant's responses were intelligent, coherent, and relevant. Dr. Waxman himself said he was able to function and that he did not feel he was intoxicated. He had the presence of mind to be both truthful and to be untruthful in answering the questions put to him. He testified he understood what was going on and responded accordingly.

Most people fear incarceration. If the conditions of confinement are contemplated as dangerous and unsanitary, this fear will be enhanced. The more vulnerable a man may be, the more anxious he may be to avoid jail. Dr. Waxman may have been more fearful than some, many, or even most, but he did not panic at the prospect of prison. Dread did not deprive him of the ability to understand advice and make decisions. Terror did not overbear his will. While Mr. Spivak's advice was motivated in part by the defendant's anxiety about spending time in jail, it was equally the result of Mr. Spivak's belief that a statement would not adversely affect the defendant's legal position and that coopera-

tion then would put him in a better position to plead guilty to lesser charges later. In short, defendant's statement was the result of reasoned legal advice, not fright. As defendant himself explained, he submitted to interrogation first, because the evidence against him was overwhelming, and second, because he did not want to go to jail. He also testified he was not intoxicated and was aware of the circumstances presented to him. For these reasons, I conclude that Dr. Waxman's confession resulted from an informed and intelligent appraisal of the benefits of making a statement and the benefits of remaining silent. It was not the result of his ingestion of drugs, his personality problems, or any coercion by the police. His confession was voluntary.

Defendant's final contention that his statement was the product of an unlawful search and seizure also is without merit. While, by this opinion and order, I have suppressed some of the objects seized, I also concluded the initial entry to the residence and seizure of certain objects was lawful. Therefore, there was no poisonous tree here from which the statement could have resulted. The fact remains that the focus of the interrogation was on the California thefts and the manner in which defendant acquired the art objects. Furthermore, it was the evidence against him on the California charges, and the Philadelphia charges which stemmed from the California thefts, which prompted defendant to speak. Thus, there was a nexus between the objects lawfully seized and the confession and my suppression of other art objects had no effect on the voluntariness of defendant's statement.

*Conclusion*

For the above reasons, defendant's motion to suppress was granted in part and denied in part by the order which I signed on August 31, 1983.